In the Matter of SUMTHIN' SPECIAL, INC., an Illinois Corporation, d/b/a Sumthin' Special Gift Shop, Bankrupt.

**Bankruptcy No. 77 B 4238.**

United States District Court, N. D. Illinois, E. D.

Jan. 24, 1980.

**744**

William A. Lester, Streamwood, Ill., for bankrupt. ·

Aldorah F. Dunning, Downers Grove, Ill., for trustee.

## MEMORANDUM OPINION AND ORDER

GRADY, District Judge.

This matter comes on for review of fees awarded by a bankruptcy judge. Rule 5.13 of our Local Bankruptcy Rules provides that where the costs of administration exceed a certain percentage of the estate, the fee award of the bankruptcy judge must be reviewed by a district judge. This is such a case. The fees recommended by the bankruptcy judge consume the entire balance of the estate left over after payment of state and federal taxes. There is no dividend for the remaining creditors.

The bankrupt, Sumthin' Special, Inc., was a small gift and greeting card shop owned and operated by a Mr. and Mrs. Tablitz at rented premises in Lisle, Illinois. The business became unprofitable, and it was decided that the assets would be sold to Carl Johnson and Martin Gartland, d/b/a Happy Family Gift Shop, also of Lisle, Illinois. The terms of the sale were negotiated by the attorneys for the parties. Somethin' Special, Inc., was represented by Attorney William Lester, and the purchasers were represented by Attorney John Rosich. A 10-page sales contract was entered into by the parties on June 9, 1977. The contract provided that the purchasers would buy the assets of the corporation, consisting of fixtures, inventory, and telephone number. The sales price was based in part upon the value of the inventory, which was to be determined by an appraisal conducted prior to closing.

The following day, June 10, 1977, Attorney William Lester filed this involuntary petition in bankruptcy on behalf of Sumthin' Special, Inc. The petition listed a secured indebtedness to the Bank of Lisle, state and federal tax liabilities, and unsecured debts in the amount of $51,000.00. The unsecured creditors were mostly suppliers, such as greeting card manufacturers. The only assets were the items subject to the sales contract entered into a day earlier. Total debts were listed at $64,000.00 and total assets at $33,000.00.

On the date the petition was filed, the bankruptcy judge appointed attorney John A. Myers, Jr. of Downers Grove, Illinois, to serve as receiver and as trustee of the bankrupt estate.

The rent on the premises was delinquent, and the landlord had threatened to seize the bankrupt's property. On June 23, 1977, Mr. Myers, as receiver, filed a petition through another Downers Grove lawyer, acting as his attorney, requesting the entry of a restraining order prohibiting removal of the property. The restraining order was entered that same date and apparently there was no further difficulty about the inventory, which remained on the premises until

the sale to Johnson and Gartland was closed.

On July 15, 1977, Mr. Myers, as trustee, filed a petition requesting leave to employ an attorney under a general retainer. The petition set forth that he wished to retain the same lawyer who had obtained the restraining order and to employ her on a general retainer "because of the extensive legal services required." The petition was allowed that same date by the bankruptcy judge, who entered an order reciting his satisfaction that the employment of the attorney ". . . is necessary and would be in the best interests of the estate, and that the case is one justifying a general retainer, . . . ."

In another petition filed the same day, July 15, 1977, Mr. Myers, as trustee, requested leave to proceed with the sale to Carl Johnson and Martin Gartland as a private sale, pursuant to the contract. The petition recited that an early sale was necessary and that it was unlikely that a higher offer could be obtained by public auction. The petition also recited the fact that the Bank of Lisle had a security interest in the inventory and fixtures in the amount of $9,600.00. The bankruptcy judge entered an order on July 15, 1977, authorizing the private sale to Johnson and Gartland for $25,102.84, the amount mentioned in the petition.

Two things had to be done to close the sale. First, the Bank of Lisle had to release its security interest in the assets. This was done by the bank in return for an assurance that it would be paid from the proceeds of the sale. The bank was represented by an attorney, Mr. Waddington, who cooperated fully in the closing. The second problem was that the State of Illinois Department of Revenue had served the prospective purchasers with a "stop order," on the ground that this was a bulk sale of the bankrupt's assets. On July 18, 1977, the trustee's attorney wrote the Illinois Department of Revenue a letter referring to the bankruptcy, the order of the bankruptcy court authorizing the sale, and requesting an audit by the Department of Revenue so that the sale could proceed. By a letter dated July 20, 1977, two days later, the Department of Revenue notified all parties that the bulk sales stop order was cancelled for the reason that

> this case is in bankruptcy. The above is an assignment for the benefit of creditors and claims have been filed. It is not a bulk sale. Bankruptcy No. 77 B 4238.

The way thus cleared, the sale was closed on July 26, 1977. From the gross proceeds of $25,102.84, the Bank of Lisle was paid $10,209.08.

Before the bankruptcy estate could be closed, it was necessary to file the final tax returns for the corporation. These returns were prepared by Robert Lester, the father of William Lester, who was the accountant for the corporation. (Robert Lester had been paid the sum of $125.00 from the estate for the preparation of these returns.)

The sale to Johnson and Gartland and the work leading to the sale constituted the only significant activity in this estate. All claims filed against the estate were allowed without contest. As indicated above, the assets of the estate were simply the fixtures, inventory and good will of the business. The only money collected for the estate in addition to the proceeds of the sale was $112.88 received as a refund of a security deposit with Commonwealth Edison, $30.66 received as the balance in the corporate checking account, and $71.71 received as a refund of an insurance premium. The bankrupt had closed its doors before the bankruptcy, and the trustee did not operate the business.

We turn now to a discussion of the fees recommended by the bankruptcy judge.

William A. Lester, attorney for the bankrupt, requested a fee of $950.00 based on 19 hours of work involved in negotiating and preparing the contract of sale and in filing the bankruptcy. Of the time claimed, 6 hours related to the sales contract. The bankruptcy judge allowed Mr. Lester $950.00, the full amount of his request.

Mr. Myers requested no fee as receiver. As noted by the bankruptcy judge, the re-

ceiver was not entitled to a fee because he collected no money and made no disbursements. As trustee, Mr. Myers requested the sum of $700.00. Using the statutory formula for trustees' compensation, 11 U.S.C. § 76(c)(1), the bankruptcy judge allowed the sum of $668.18.

The attorney for the trustee filed a petition claiming the expenditure of 70 hours time and requesting a fee of $3,500.00.

The bankruptcy judge disallowed the time claimed by the attorney for attendance at the first meeting of creditors on the ground that Section 47 of the Bankruptcy Act provides that the trustee should be present at the first meeting. The attorney's time spent in checking the bankruptcy claim file and in preparing the trustee's final report and account was also disallowed, again on the ground that these were trustee's duties. The attorney had claimed 2½ hours for attending the creditors' meeting, 2 hours for checking the claim file and 4 hours for preparation of the final report and account.

The bankruptcy judge recommended that the attorney's fee be reduced to $2,750.00. He found that

. . . Her performance as Mr. Myer's attorney was exemplary in rendering legal services. She rendered valuable legal services to the trustee in dealing with Lidown commercial properties and[1] Sumthin' Special's landlord. She obtained release of the Illinois Department of Revenue stop order on the bulk sale Somethin' Special had wished to make. (Report of Bankruptcy Judge, p. 4).

This was the only finding made by the bankruptcy judge as to what services the trustee's attorney had rendered to benefit the estate. There is no further reference to the various items of work described in her petition and no analysis of the time she claims to have spent in doing that work.

The attorney's petition claims that she spent a total of 13¼ hours on the telephone, talking with such persons as the attorney for the landlord, the attorney for the bank, the attorney for the purchasers and personnel in the Illinois Department of Revenue. Some of these telephone conversations are described as having lasted more than an hour. The minimum time claimed for any telephone conversation is one-half hour.

Eleven and one-half hours are claimed for appearances in bankruptcy court, including travel time. Nine and one-half hours are claimed for preparation of various bankruptcy court papers, including the 4 hours for preparation of the final report and account.

The remaining items are miscellaneous—various meetings, letters, "reviewing" of documents and the like. Interestingly, there is not a minute claimed for any conferences with the trustee. Mr. Myers is not even mentioned in her attorney's fee petition.

It is apparent on the face of the attorney's petition that much of the work for which she claims compensation should have been performed, if at all, by the trustee. As indicated, the bankruptcy judge found that 8½ hours of the 70 hours claimed were spent on trustee's work. My own view of the petition is that of the 70 hours claimed, 53¾ hours are attributed to work which, if necessary, could and should have been performed by the trustee rather than the attorney. In other words, it is my view that the attorney's petition describes, at most, 16¼ hours of work for which an attorney's rate could properly be charged the estate.[2]

1. The "and" is inaccurate. Lidown and the landlord were one and the same.

2. These 16¼ hours are as follows:

| 1977 | |
|---|---|
| 6/23 | ½ hr. |
| | 2½ hr. |
| 7/1 | ¾ hr. |
| | ¼ hr. |
| 7/14 | ¾ hr. |

| 1977 | |
|---|---|
| 7/15 | 2½ hr. |
| 7/20 | 1¾ hr. |
| 7/28 | 1¼ hr. |
| | 1 hr. |
| 7/29 | 2½ hr. |
| **1978** | |
| 2/1 | ½ hr. |
| 2/3 | 2 hr. |

Most of the telephone conversations, for instance, related to matters which any competent trustee should be able to handle. The attorney claims a number of hours spent in gathering records of the bankrupt for submission to the Department of Revenue. This was simply leg work that could have been done by the trustee. She claims 2 hours for delivering the bill of sale and the keys to the purchasers after the sale. She claims 8 hours for a meeting with a Mr. Swanson from the Department of Revenue to audit the bankrupt's records. If it was necessary for someone to be there for 8 hours, which is hardly conceivable, it is the trustee who should have been there.

Our Local Rule 5.13 requires that, before a district judge can reduce the fees recommended by the bankruptcy judge, a hearing must be held. We did.hold a hearing in this case, and the trustee's attorney, along with Messrs. Myers and Lester, appeared. No creditor appeared to object to the fees, nor had there been any objection in the bankruptcy court. Thirty-nine proofs of claim were filed by unsecured creditors, but, as is typical of so many bankruptcy cases, the creditors did nothing beyond the filing of their proofs. There was no one to object to anything that was done.

The "hearing" under these circumstances amounted to an extended colloquy between myself on the one hand and the attorney and Messrs. Myers and Lester on the other. My purpose was to ascertain how this much time could possibly have been spent by the trustee's attorney on a matter of such apparent simplicity. No satisfactory explanation was given. The attorneys responded in generalities to almost every question put by the court. They emphasized what *could* have gone wrong if the Illinois Department of Revenue had obstructed the sale, or if the Internal Revenue Service had interfered, or if the Bank of Lisle had not been agreeable to having its lien satisfied out of the proceeds. When it was pointed out to the attorney and Messrs. Myers and Lester that none of these things did occur, that in fact things had gone quickly and smoothly, and that there simply was no motivation for anyone to have obstructed the sale, both

Mr. Myers and Mr. Lester explained how in dealing with government agencies in *other* cases they had been delayed and harassed by bureaucratic bungling. Mr. Myers informed us that he is not only an attorney but also a certified public accountant and a former college accounting professor. (Tr. p. 13).

The trustee's attorney produced her complete file. I have read every document in the file, and there is still nothing to account for the large amount of time she claims to have spent. Most of the documents were prepared by persons other than the attorney, e. g., copies of notices from the State of Illinois, copies of tax returns, copies of a few proofs of claim. Her own production consists of a few routine letters and copies of the several pleadings filed by the trustee in the bankruptcy court. There is no legal research and no document of any kind indicating that this matter was other than completely routine.

At one point in the hearing, the attorney volunteered that she had gotten out of bed at midnight on five different occasions to travel to the store premises, some two miles from her house, in response to notification from the police that the burglar alarm had gone off. (Tr. p. 30) Her fee petition did not refer to these nocturnal activities. Her purpose in mentioning them was apparently to suggest that the case presented difficulties which do not meet the eye. However, this errant burglar alarm appears to be the only such problem.

█ Rule 5.13 provides that the recommendations of the bankruptcy judge are of no effect until approved by the district judge. In this case, therefore, the trustee had no authority to disburse any fees without approval of this court. However, the papers produced by the trustee's attorney include Xerox copies of checks issued by Mr. Myers as trustee, to himself, to his attorney and to Mr. Lester, all in the amounts recommended by the bankruptcy judge. These checks were issued and negotiated more than 30 days before the bankruptcy judge even entered his order recommending fees

in those amounts. I assume the bankruptcy judge is unaware of this violation of Rule 5.13.

At the conclusion of the hearing, the attorney submitted her time records, or rather a reconstruction of her time records, since the original "was in such bad state." (Tr. p. 46) In going over this time sheet after the hearing I find it indicates that the attorney spent not 70 hours on this case but 91 hours. There is no explanation as to why she claimed only 70 hours in her fee petition.

Whether the figure be 91 or 70, it is not possible that a competent attorney would spend anything like that much time on this case. (I refer here to the total time claimed by the attorney, whether it be considered legal work or trustee's work.) Most lawyers feel they are doing well if they can manage 6 chargeable hours a day. If the attorney spent 70 hours on this case, that amounts to 11½ lawyer days. If she spent 91 hours, that amounts to 15 lawyer days— or 3 solid weeks.

■ Enough has been said to demonstrate that the fee petition of the trustee's attorney cannot be taken at face value. She either did not spend the time she claims to have spent or she spent it unnecessarily. Further investigation, such as taking testimony of those persons with whom she claims to have spent so much time, would probably show which of these alternatives is true. That is not necessary for present purposes, however, because even giving the attorney the benefit of the doubt and assuming that she did put in the hours claimed, she clearly cannot be compensated for unnecessary work which did not benefit the estate. Neither can she be compensated for work which, necessary or not, was not legal work. Turning from the question of whether the work was performed at all, it is appropriate to discuss the question of whether they attorney should have been retained in the first place.

Bankruptcy Rule 215 provides, in relevant part:

(a) Conditions of Employment of Attorneys and Accountants. No attorney or accountant for the trustee or receiver shall be employed except upon order of the court. The order shall be made only upon application of the trustee or receiver, stating the specific facts showing the necessity for such employment . . . . The employment of any attorney or accountant shall be only for the purposes specified in the order, but the court may authorize a general retainer of an attorney when necessity therefore is shown.

By requiring court authorization prior to the retaining of an attorney, Rule 215 is obviously aimed at saving unnecessary expense to the bankrupt estate. As Collier notes in his treatise, "the determinative question is whether it is reasonably necessary for the welfare of the estate to have counsel or an accountant employed." 12 Collier on Bankruptcy ¶ 215.04, at 2–181 (14th Ed. 1975, Supp.1978). To enable the bankruptcy court to determine whether legal services *are* "reasonably necessary" for the welfare of the estate, the Rule anticipates that the trustee will make a particularized showing of need in his or her application. And, "only in exceptional circumstances may an attorney be appointed on a general retainer." *Id.*

■ In this case, Mr. Myers' "Petition to Employ Attorney Under General Retainer" is patently insufficient under the Rule. Paragraph 4 of the Petition stated only that an attorney was necessary "to prepare . . necessary petitions, answers, orders, reports and other papers in the sale of personal property; to perform all other legal services . . . which may be necessary herein." The Petition set forth no specific facts which could have led the bankruptcy judge to conclude that the services of an attorney were "reasonably necessary for the welfare of the estate." A fortiori, the bankruptcy court abused its discretion in authorizing Mr. Myers to employ an attorney on a general retainer, which, as noted above, should be reserved for exceptional cases.

Most of what the attorney claims to have done was ministerial and within the scope

of responsibilities a trustee normally assumes when he or she accepts appointment. *See generally*, Paskay, *Handbook for Trustees and Receivers in Bankruptcy*, contained in 11 A. Collier on Bankruptcy § 15.004[2], at 496 (1978). Under the bankruptcy rules, an attorney may be compensated only for "professional services." Rule 219(c)(3). We should not award the attorney any fees for tasks which required no legal expertise and should have been performed by the trustee. *See In re Mabson Lumber Co.*, 394 F.2d 23, 24 (2d Cir. 1968).

This case is an example of what often happens when the bankruptcy court appoints an attorney to represent a trustee who is also a member of the bar. We agree with Collier that

> [F]requently an attorney is appointed receiver or elected trustee precisely on account of his skill and knowledge as a lawyer. Yet it would not be fair merely because of his competence to require the trustee-attorney to render any kind of legal service incident to the administration, such as prosecuting a complex action to set aside a fraudulent conveyance or preferential transfer, or litigating an intricate tax matter, and the like . . . .
> [A] careful distinction should be drawn between the trustee's official duties, including services of a legal but mere routine character, and extraordinary services of a legal expert. The problem is to strike a fair balance between the legitimate expectations of the creditors to see the trustee discharge his legal duties without extra expense to the estate, and the no less legitimate expectation of the trustee-attorney to be either compensated for any extraordinary legal services at the rate customary for compensation of attorneys in bankruptcy proceedings or to be under no duty to render them.

3A Collier on Bankruptcy ¶ 62.12, at 1471, 1472 (14th ed. 1975, Supp.1978).

If an attorney is appointed trustee and then discovers that the administration of the bankrupt estate requires "extraordinary legal services," the trustee may obtain a court order permitting him or her or some other attorney to act as attorney. *See* Bankruptcy Rule 215(e). The Seventh Circuit has upheld a bankruptcy court's award of fees at differential rates to an attorney who represented himself as trustee. *In re Hamilton Distributors, Inc.*, 440 F.2d 1178, 1180 (7th Cir. 1971). In that case, the court noted that the SEC and the Administrative Office of the United States Courts encouraged the practice of appointing, and compensating, the same person as receiver and attorney, for economy reasons. *Id.* at 1180. The Second Circuit Court of Appeals has expressed disapproval of appointment of counsel for an attorney-trustee, especially "in the case of small or medium sized estates heading for liquidation, since there is little reason why two people should have to familiarize themselves with the relevant facts at the estate's expense." *In re Mabson Lumber Co.*, 394 F.2d 23, n. 3 at 24 (2d Cir. 1968). *See also, Matter of Kinsbursky*, 26 F.2d 91, 92 (W.D.Pa.1928) (referee did not abuse discretion in refusing application of trustee-attorney for appointment of additional counsel); *Ohio Valley Bank Co. v. Mack*, 163 F. 155 (D.Ohio 1926) (allowance of attorney's fees by referee unreasonable and in violation of the spirit of the bankruptcy laws where trustee, himself a lawyer, employed a lawyer to do trustee's work).

This matter of attorneys charging attorneys fees for doing trustee's work has been a constant problem in this district. The practice continues despite the many unreported decisions of district judges reducing the excessive fees recommended by bankruptcy referees. There is a basic antagonism between the public policy of avoiding unnecessary expense to the estate and the desire of an attorney to be paid at rates he considers appropriate for his profession. What he conveniently forgets is that when he performs the ordinary functions of a bankruptcy trustee he is not practicing his profession. He has elected to occupy his time with tasks a competent layman can do as well.

When one person serves as both trustee and attorney for the trustee, there is a

temptation for him to minimize his work as trustee and enlarge his role as attorney. The same problem exists where, as here, the trustee and the attorney are two different persons. Instead of the attorney being limited to specific items which genuinely require legal expertise, he frequently becomes ubiquitous, performing clerical tasks and claiming an attorney's rate of compensation for doing them. This will only infrequently diminish the compensation of the trustee, who generally receives the maximum statutory fee regardless of who does the work. In this case, the trustee was allowed a fee of $668.18 by the bankruptcy judge. The trustee's fee petition does not describe specifically what work he did. It simply recites that he "did perform all duties required of such trustee." If his attorney really did everything she claims to have done, it is difficult to see what was left for Mr. Myers.

The bankruptcy judge's praise of the attorney's performance requires comment. First of all, it is simply not true that the attorney rendered "exemplary" service in this matter. The only two items of work cited by the bankruptcy judge—the obtaining of the restraining order against the landlord and the removal of the stop order issued by the Department of Revenue—were routine. There was no opposition to the restraining order, which was issued *pro forma*. Nor did the restraining order achieve anything for which the estate did not pay in full. The landlord was paid $1,100.00 in "administrative rent" for the time the goods remained on the premises prior to the sale. As far as the Revenue Department stop order was concerned, this was lifted immediately when the Department concluded on its own, that this was not a bulk sale to which that procedure applied.

This is not the first case in which the report of a bankruptcy judge has praised ministerial work performed by members of the bankruptcy bar. Unfortunately, it is a frequent occurrence. In fairness to the bankruptcy judge in this case, I have seen performances more routine than those in this case extolled with such enthusiasm as to make the comments here seem ambivalent. But the report in this case is typical in another respect. The inflated fee of the attorney is reduced by the bankruptcy judge, giving the impression that a meaningful review has occurred and the reduced fee is a fair one. In all too many instances, this is an illusion.

District judges in this district review only a small percentage of the fees approved by bankruptcy judges, due to the fact that Rule 5.13 calls for review only when the costs of administration exceed certain percentages of the estate. In the vast majority of cases, involving in the aggregate untold millions of dollars in fees there is no review whatever of what the bankruptcy judges do. And, as noted earlier, there is almost never any opposition from creditors or their attorneys. Where bankruptcy fees are concerned, the adversary process is usually non-existent. When abuses like the instant one occur in cases where the bankruptcy judges know their actions will be reviewed by a district judge, it is disturbing to contemplate what can happen when there is no review.

■ I will approve the $950.00 fee recommended for William Lester, attorney for the bankrupt. His time charges appear to be in order, and the work he did was valuable to the estate. His activities prior to the bankruptcy and his preparation of the bankruptcy petition constituted most of the work that was required for the liquidation of this business.

■ The statute relating to trustees' fees, 11 U.S.C. § 76(c)(1), provides that when the trustee does not conduct the business of the bankrupt he shall receive as a fee "such sum as the court may allow," but in no event a sum in excess of a designated percentage of the estate. The statute then sets out a formula for computing the percentage. In this case, the bankruptcy judge allowed the trustee the sum of $668.18, the maximum permitted under the statutory formula, to the penny. It seems clear that the maximum fee was not justified in this case, where practically all of the work is

claimed to have been done by the trustee's attorney. The statute contemplates that the court will use judgment, not that it will automatically award the maximum fee in every case.

As for the trustee's attorney, it is clear that she should not have been hired on a general retainer. If her hiring was proper at all, it was to perform specific services requiring the attention of an attorney other than the trustee-attorney. I can find none of those in this case. The matters involved in the 16¼ hours of legal work were not complicated. And, in view of all the circumstances, I cannot even accept at face value the claim that 16¼ hours was spent.

The attorney's fee petition is based upon $50.00 per hour for 70 hours. The bankruptcy judge disallowed some of those hours, but did not disapprove the notion of computing the fee on the basis of an hourly charge. Quite aside from the fact that the number of hours claimed by the attorney is excessive, I believe it is inappropriate to base the fee in a case such as this solely on the time claimed to have been spent. What was involved here is quite analogous to a real estate closing. The seller had $25,-000.00 in personal property, encumbered by a $10,000.00 chattel mortgage. The mortgage had to be paid out of the closing, and other "title" objections—tax claims and the claims of general creditors—had to be cleared before title could be passed to the purchasers. The payout to the Bank of Lisle in this case was no more complex than the payout to the seller's mortgagee in the usual real estate closing. The lifting of the Department of Revenue stop order was no more difficult than obtaining the waiver of many of the kinds of objections which appear on a typical title report. The one difference between this case and a simple real estate closing was that counsel had to make a few appearances on uncontested matters in the bankruptcy court.

The fees allowed by the bankruptcy judge to Messrs. Lester and Myers and the trustee's attorney total $4,368.18. Comparison of that amount to what a lawyer would customarily charge in a $25,000.00 real estate transaction, even a complicated one, demonstrates its patent excessiveness. Five hundred dollars would be the maximum any ethical lawyer would think of charging for such a real estate transaction. Taking just the fees of Mr. Lester and Mr. Myers in this case, they amount to $1,618.18. This, in my view, should have been an ample fee for the accomplishment of everything that occurred here. We do not know what Mr. Myers did for his $668.18, but, building upon what Mr. Lester had already accomplished, he should have been able to wind up the transaction for that amount. This tiny estate should not have been drained any further, and I have difficulty justifying any payment whatever to the trustee's attorney. However, since the attorney may have done all or most of whatever work was done, it would be unfair to her, vis a vis the trustee, to disallow any fee for her while allowing a fee to the trustee. I will allow the sum of $1,000.00 as the combined compensation of the trustee and his attorney. If the trustee and the attorney are unable to agree upon a division of the $1,000.00, the bankruptcy judge shall conduct a hearing to determine an equitable division.

The attorney and the trustee have prematurely received the sums of $2,750.00 and $668.18, respectively. Together, they must refund a total of $2,418.18. The refund to be made by each will be determined by his or her share of the $1,000.00. The refund shall be made by March 31, 1980. The cause is remanded to the bankruptcy judge with directions to oversee the repayment to the trustee and to take proper steps to see that the disgorged funds are distributed as a dividend to general creditors. When this has been accomplished, the bankruptcy judge should furnish me with a final report showing what disposition has been made.