## In re RHEAM OF INDIANA, INC., Debtor.

### Bankruptcy No. 87–06459S.

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 26, 1990.

Anthony Barone, Philadelphia, Pa., Trustee.

Aris J. Karalis, Philadelphia, Pa., for Trustee.

James J. O'Connell, Ass't. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

Jonathan Ganz, Philadelphia, Pa., for debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

This apparently simple Chapter 7 bankruptcy case has become the scene of a battlefield on which the law firm which is counsel for the Trustee, Ciardi, Fishbone, and DiDonato (hereinafter referred to as "CFD"), has chosen to "litigate" several issues which it is believed will serve its benefit in obtaining larger fees in this and apparently future similar cases. The choice of this case as the battlefield seems based on two considerations: (1) As the placing of quotation marks around the word "litigate" was meant to convey, there is no active participation in any facet of this case by either the Debtor or any creditors and hence no opposition to these efforts; and (2) The estate, fortuitously and unexpectedly, contains considerable assets which can be tapped to provide compensation for CFD's pursuits if the court approves same.

In addition to CFD's own Application for compensation and reimbursement of expenses totalling $12,960.92, we have before us an Application of the Trustee for compensation of $2,386.02 and an Application of an auctioneer seeking commissions of $4,924.21 and an eye-popping sum for reimbursements of $26,663.81, compensation totalling $31,588.02.

We conclude that CFD's request for compensation must be reduced from the re-

quested sum of $12,960.92 to $6,521.42. The main reasons for these reductions are that (1) As we initially predicted, the legal problems presented by this estate, apart from appeals relating to its own appointment, are few and simple, justifying compensation for the Trustee's counsel at a rate no higher than $125 per hour; and (2) The pursuit of an interlocutory appeal and a moot appeal of matters related solely to CFD's appointment and compensation as counsel were of no benefit to the estate whatsoever and cannot therefore be compensated from its assets.

We grant the Trustee's Application for compensation in the full amount sought of $2,386.02. In lieu of the outright denial of costs incurred by the auctioneer before its appointment, as would be dictated by strict application of the principles which we set down in *In re Schwemmer Hardware Co.*, 103 B.R. 635, 641–42 (Bankr.E.D.Pa.1989), we reduce the reimbursement of costs to $10,000, and award the auctioneer a total sum of $14,924.21.

### B. HISTORY OF THE CASE

This case was uneventfully filed on December 29, 1987. At some date not referenced on the docket, Anthony Barone, a non-attorney who was, for an extended period, a member of this court's Trustee panel, was appointed as Trustee (hereinafter Mr. Barone is referred to as "the Trustee"). On February 5, 1988, CFD filed a *pro forma* Application to be appointed as the Trustee's counsel. No specific references to facts of the instant case justifying appointment of counsel were made. Instead, the Application indicated that CFD proposed to perform the following generalized services:

a) to give the Trustee legal advice with respect to his powers and duties in this Chapter 7 proceeding;

b) to prepare on behalf of your applicant as Trustee the necessary applications, answers, orders, reports and other legal papers;

c) to advise and to counsel the Trustee with respect to the anticipated sale of Debtor's property;

d) to perform all of the legal services for the Trustee which may be necessary herein; and

e) to review all proofs of claim and claims in this matter and prepare a final accounting and final order of distribution.

Applications of Chapter 7 Trustees for counsel are submitted and granted *ex parte* by this court, if warranted, pursuant to Local Rule 9013.3(b)(6). In this case, we noted that the Schedules listed $139,750.00 as the total of the Debtor's liabilities and $51,750.00 as the total of the Debtor's assets. The specific assets enumerated were a $1,500 bank account, $250 in furnishings, and $50,000 in inventory, valued "at cost." After an unsuccessful attempt by our law clerk to get more information from the Trustee to support his Application, our law clerk called counsel for the Debtor to get further clarification on the value of the inventory. She was advised that the present value of the assets was no more than twenty (20%) percent of the cost of same. We therefore entered the following Order:

AND NOW, this 10th day of February, 1988, upon consideration of the Application of the Trustee to Employ Counsel, it is

ORDERED that the Application is DENIED, pending a showing that the Debtor's assets are sufficient to justify such appointment. Counsel for the Debtor advises that the inventory is listed as valued at $50,000 "at cost," but is worth no more than twenty (20%) percent of that figure. The Trustee should be able to administer this small estate without a need for appointment of counsel. *See In re Pioneer Sample Book Co.*, 374 F.2d 953, 960–61 (3d Cir.1967).

This Order was inexplicably not docketed by the Clerk until March 3, 1988.

On March 4, 1988, CFD filed what it termed a Second Application for Appointment of Counsel for the Trustee, but was in substance a Motion that we reconsider our Order of February 10, 1988. In that Application, CFD alleged, *inter alia*, as follows:

3. On March 3, 1988, the landlord in the subject proceeding denied the Trustee and the Trustee's Agent, Comly Auction Company, access to the Debtor's assets. The landlord has indicated that access will not be granted without an Order of Court.

4. The Trustee has attempted to liquidate the bank accounts of the Debtor located at Continental Bank. Continental Bank has refused to turn over said accounts at this point in time, even after receiving the Order appointing the Trustee.

5. For the reasons indicated in paragraphs 3 and 4, the Trustee requires the preparation and filing of necessary pleadings in order to properly perform his statutory duties in this matter. The retention of counsel experienced in matters of this type is required and will benefit the estate.

6. Without a prompt inventory, appointment of auctioneer and sale of estate assets, the administrative rent claim of the landlord continues to accrue, thereby potentially depriving holders of unsecured claims with a distribution in this matter. The denial of counsel will do nothing more than allow all assets of this estate to be liquidated or seized by the landlord.

We still questioned the propriety of appointment of counsel, because we believed that the value of the inventory assets of the Debtor were minimal, as we stated in our Order of February 10, 1988, and no allegations in the Second Application indicated to the contrary. Therefore, we instructed CFD to notify all interested parties of the Second Application, pursuant to Local Rule 9013.3(d), contemplating five days notice to interested parties and entry of an order upon the filing of a Certificate of No Objection seven days after service. CFD served the Application but did not file a Certificate of No Objection until April 4, 1988. On that same day, we entered the following Order:

AND NOW, this 4th day of April, 1988, upon consideration of the Second Application of the Trustee to Employ Counsel, Notice, and Certification of No Objection, it is

ORDERED that CIARDI, FISHBONE & DiDONATO is appointed as counsel to the Trustee. However, counsel must establish, on any Application, that its services are necessary. Counsel shall also be limited to compensation at the rate of $125/hr.

On March 10, 1988, CFD appealed this court's Order of February 10, 1988, to the district court. Upon the entry of our Order of April 4, 1988, not only did CFD not discontinue that appeal, but it also appealed the April 4, 1988, Order to the district court as well, insofar as we limited its compensation to $125 per hour.

The administration of the case proceeded. Only two contested matters emerged. The first was a motion filed on March 24, 1988, by the Debtor's landlord to compel the removal of the Debtor's inventory from the store where it was located. We denied that motion on April 27, 1988, indicating that the landlord's sole measure for seeking redress was a motion seeking relief from the automatic stay under § 362(d). Before a hearing could be held on the § 362(d) motion, the matter was resolved by the Trustee's agreement to have William F. Comly & Sons Co. (hereinafter "Comly"), an auctioneer firm, remove the inventory. The second was a preference action litigated entirely by Aris J. Karalis, Esquire, of CFD against the aged and ailing President and sole stockholder of the Debtor, who appeared *pro se.* After a trial of September 7, 1989, we entered judgment in favor of the Trustee for $2,000. No objections to any proofs of claim have ever been filed, nor have any disputes with Continental Bank persisted.

On May 3, 1988, CFD filed a motion to appoint Comly as auctioneer to dispose of the Debtor's inventory. Although no objection was filed, a Certification of No Objection to this appointment was not filed until July 18, 1988. Upon receipt of the Certification, we promptly entered an Order appointing Comly, effective on the date of the Order, July 19, 1988. The Order autho-

rized Comly to receive a commission at the following rates "plus expenses:"

10% of the first $10,000.00;

7.5% of the next $40,000.00;

5% of the next $50,000.00;

3% of the next $100,000.00; and

1% on all amounts above $200,000.00 realized from the sale.

Comly filed an Application for compensation on October 4, 1988, indicating that the Debtor's inventory, which its counsel had valued at about $10,000, was in fact sold for $68,484.18. Comly requested that it be awarded not only $4,924.21 for commissions computed pursuant to the formula in the Order and $2,970.99 for advertising costs, but also $23,692.82 for unexplained "labor" employed in its undertaking.

■ The appeal from our Order of February 10, 1988, suffered from the following defects: (1) It was apparently rendered of no effect by the filing of the Second Application of March 4, 1988, in the nature of a motion to alter or amend our Order of February 10, 1988, pursuant to B.Rule 9023. *See* B. Rule 8002(b)(3); (2) It was an appeal from an interlocutory order and could be considered only upon leave of the district court to file an interlocutory appeal. *See* 28 U.S.C. § 158(a). No motion seeking such leave was ever filed; and (3) It was rendered moot by our Order of April 4, 1988.

Nevertheless, CFD persisted with the appeal. The United States Trustee (hereinafter "UST"), not noting any of the foregoing defects, participated in the appeal and submitted a Brief on behalf of the Trustee. The capacity in which the UST acted was unclear, since it had filed no pleading nor notice of appeal relating to this matter in this court. On May 31, 1989, the appeal was dismissed as moot *sua sponte* by Order of the Honorable Robert S. Gawthorp, III, of the district court.

The appeal from our Order of April 4, 1988, was likewise prosecuted without regard for 28 U.S.C. § 158(a) despite the interlocutory nature of the Order of which it sought review. *See* pages 101–02 *infra*. On April 3, 1989, the district court, per the Honorable Herbert J. Hutton, filed a Memorandum and Order, reported at 98 B.R. 193, vacating that aspect of the Order limiting CFD's compensation to $125 per hour. In that Memorandum, Judge Hutton stated that this court, in rewarding compensation of counsel,

must consider a number of factors, "including the difficulty of the task, the prevailing market rate for counsel of petitioner's experience, counsel's normal billing rate, and the rates awarded by other courts under similar circumstances." *Jungkurth* [*v. Financial Services, Inc.*, 87 B.R. 333,] 337 [E.D.Pa.1988] (citing *Swicker v. William Armstrong & Sons, Inc.*, 484 F.Supp. 762, 767 (E.D.Pa. 1980)).

The court implicitly held such factors "cannot be determined in advance" of their performance, *id.*, and hence that the entry of an order of appointment containing a limitation on counsel's hourly rate was inappropriate.

On October 3 and October 4, 1989, respectively, CFD filed the Trustee's Final Accounting and Allowance of Compensation and the Application of the Auctioneer for Compensation on behalf of Comly in this case. As previously was indicated, at page 92 *supra*, Comly's Application included a request for commissions at $4,924.21 on the basis of the formula set forth in the Order of July 19, 1988, appointing it and, in addition, "labor expenses" of $23,692.82 and advertising expenses of $2,970.99. No receipts or other documentation for any of the expenses for which reimbursement was sought were provided.

On November 21, 1989, CFD filed an Amended Application on behalf of the Trustee and an Application for Allowance of its own Final Compensation. The Amended Application for the Trustee merely provided the computation of the maximum commissions allowable under 11 U.S.C. § 326(a), which calculated to $2,386.02, and requested that we award same.

The Application for CFD's own Compensation requested a total sum of $12,960.92. The professionals for whose services com-

pensation was requested and their respective hourly rates were summarized as follows:

| | RATE | HOURS | TOTAL |
|---|---|---|---|
| Edward J. DiDonato | $175.00 | 24.00 | $ 4,200.00 |
| | 185.00 | 12.70 | 2,349.50 |
| Aris J. Karalis | 115.00 | .80 | 92.00 |
| | 125.00 | 30.00 | 3,750.00 |
| Patrick J. Casey | 130.00 | .20 | 26.00 |
| Christina Q. Lentz | 70.00 | 32.50 | 2,275.00 |
| | | TOTAL | $12,692.50 |

In addition, reimbursement of costs of $258.42 were sought, $225.00 of which were expended in connection with prosecution of the two appeals by CFD to the district court. Much of the services for which compensation was sought, particularly by Mr. DiDonato, were expended in the prosecution of the appeals from our Orders of February 10, 1988, and April 4, 1988.

All of the foregoing Applications came before us at a Final Audit Hearing in the case on January 11, 1990. After a colloquy with Mr. Karalis, who appeared for CFD, we entered an Order of January 17, 1990, providing as follows:

1. The Trustee and the Auctioneer shall submit Amended Applications in conformity with the procedural requirements set forth in our Opinions in *In re Samson Industries, Inc.*, [108 B.R. 545 (Bankr.E.D.Pa.1989)]; and *In re Schwemmer Hardware Co.*, 103 B.R. 635, 639–40 (Bankr.E.D.Pa.1989), respectively, on or before February 12, 1990.

2. Counsel for the Trustee and any interested parties are given the opportunity to file Briefs addressing counsel's position that (1) it is entitled to compensation at a rate in excess of $125/hr; and (2) it is entitled to compensation on the two appeals taken to district court in connection with its appointment, on or before February 12, 1990.

These submissions were timely filed.

C. THE TRUSTEE IS ENTITLED TO THE REQUESTED COMMISSION OF $2,386.02.

■ We have little difficulty in awarding the Trustee the full commissions of $2,386.02 which he seeks. In a submission including a description of his services, the Trustee claims that he spent a total of 173.85 hours in connection with his duties and expects to spend five hours more. He values his services at $50/hour. Using a lodestar calculation, the Trustee's compensation would compute to almost $9,000. The hourly rate is within the range of reasonability as established in *Samson Industries, supra,* 108 B.R. at 549–51 (hourly rate of Trustee who had been dilatory in performance of his duties computed at a rate of $25/hr). *Cf. In re J.E. Jennings, Inc.,* 100 B.R. 749, 753 (Bankr.E.D.Pa.1989) (non-attorney Secretary of Creditors' Committee awarded compensation at a rate of $50/hr). The Trustee's declared services include over 50 hours supervising Comly's employees, in May, 1988; 16 hours attending auction sales; and attending numerous meetings over two hours in length with the landlord, the Assistant UST, and various parties involved with purchase of the estate's assets. While these declarations, as claims of compensable time, appear to us to be clearly excessive, they are not so excessive that a sum of $2,386.02 is an unreasonable measure of the value of the Trustee's services. Therefore, this Application will be granted in full at the maximum amount allowable under 11 U.S.C. § 326(a), *i.e.,* $2,386.02.

D. HAVING PERFORMED ALL SERVICES FOR WHICH IT SEEKS COMPENSATION AND HAVING EXPENDED ALL OF COSTS FOR WHICH IT SEEKS REIMBURSEMENT *PRIOR* TO ITS APPOINTMENT, COMLY WOULD, BY APPLICATION OF THE PRINCIPLES OF *SCHWEMMER HARDWARE,* BE DENIED ALL OF ITS REQUESTS FOR COMPENSATION; HOWEVER, WE SHALL ALLOW IT THE REQUESTED COMMISSIONS OF $4,924.21, PLUS COSTS OF $10,000, ON EQUITABLE GROUNDS.

■ In *Schwemmer Hardware, supra,* 103 B.R. at 638–39, we made it clear that auctioneers are "professional persons" subject to the requirements of 11 U.S.C. §§ 327(a), 328, and 330. Specifically, we there held that, in order for an auctioneer

to receive compensation and reimbursement of costs from the estate, it must be appointed as a professional prior to performance of the services and expenditure of the costs for which compensation is sought. *See, e.g., In re St. Joseph's Hospital,* 102 B.R. 416, 417 (Bankr.E.D.Pa.1989); and *In re 31–33 Corp.,* 100 B.R. 744, 746–47 (Bankr.E.D.Pa.1989). The only exception to requiring appointment prior to performance of services arises if and when the professional moves for appointment *nunc pro tunc* and makes the requisite showing of the presence of "extraordinary circumstances." *See In re F/S Airlease II, Inc. v. Simon,* 844 F.2d 99, 105–08 (3d Cir.1988); *In re Arkansas Co.,* 798 F.2d 645, 648–51 (3d Cir.1986); *In re TM Carlton House Partners, Ltd.,* 93 B.R. 875 (Bankr.E.D.Pa. 1988); *St. Joseph's Hospital, supra,* 102 B.R. at 417; and *31–33 Corp., supra,* 100 B.R. at 746–47. On this basis, we denied reimbursement of all pre-appointment labor costs sought by an auctioneer in *In re Joshua Slocum, Ltd.,* Bankr. Nos. 88–14082S and 88–14083S (Bankr.E.D.Pa. Dec. 19, 1989).

In *Schwemmer Hardware, supra,* 103 B.R. at 639–40, we also indicated that an auctioneer need not recite the services performed in great detail to receive its commissions, but that, to receive reimbursement of costs, it was obliged to provide the detail which we deemed necessary for all professionals seeking such reimbursement in *In re Metro Transportation,* 78 B.R. 416, 420 (Bankr.E.D.Pa.1987), *aff'd in part & remanded in part on other grounds,* 107 B.R. 50 (E.D.Pa.1989); and *In re Mayflower Associates,* 78 B.R. 41, 47–48 (E.D.Pa.1987). That detail usually must include documentation of all items for which reimbursement will be sought by an auctioneer with receipts.

We also addressed a request by the auctioneer, in *Schwemmer Hardware,* for the costs of its "labor." *Id.* at 641–42. We compared an attempt of the auctioneer to request such labor costs, in addition to its commissions, to an attorney who charges a contingent fee for his services, and also improperly attempts to add to the contingent fee the value of its services through a lodestar calculation. *Id.* As a result, all of the *Schwemmer Hardware* auctioneer's labor costs were disallowed. *Id.*

In the instant case, Comly was specifically appointed by this court to sell the Debtor's inventory at a public sale. The Order of appointment, quoted at page 92 *supra,* detailed the formula for calculation of commissions which Comly was to receive. The Order also provided, without any further description, that Comly was to be allowed its "expenses."

On February 12, 1990, a description of Comly's services for which compensation was sought was provided to us for the first time. The sale was apparently effected in three auctions, conducted on May 24, 1988, May 31, 1988, and June 14, 1988. A commission of $4,924.21 was computed on the proceeds. The advertising expenses of $2,970.99 were not documented by receipts.

Even had Comly sought an award of only the $7,895.20 which represented the sum of these two charges, recovery by Comly of any amount would be impermissible under application of the principles set down in *Schwemmer Hardware.* All of the services were performed and expenses incurred *prior* to Comly's appointment. Furthermore, no documentation of the expenses was provided.

However, had Comly's request been confined to this sum, it would at least have constituted a demand within the normal scope of its engagement, as described in its Application and approved by our Order, and within the scope of items for which compensation and reimbursement, if properly requested and documented were allowable in *Schwemmer Hardware. Id.* at 642.

However, Comly has demanded much more. It has requested $23,692.82 compensation for labor and expenses for removing the Debtor's inventory, storing it, preparing it for the auction sale, and, apparently, conducting the auction sale. These expenses are summarized, in its Supplemental Application, as follows:

| | |
|---|---|
| Casual Labor 5/4 to 6/4 560 Hrs. @ $6.35 Per Hr. | $ 3,556.00 |

| | |
|---|---|
| Jim Horbury Supervisor 21 Man Days @ $125.00 Per Day | $2,625.00 |
| Labor to Clean Up Premises (Independent Contractor) | 1,300.00 |
| Trash Removal Service (Independent Contractor) | 2,200.00 |
| Forklift Rental 4 Weeks @ $285.00 Per Week | 1,140.00 |
| Trucking (15 loads) from 19th & Indiana to Comly & Son | 2,090.00 |
| Warehouse Use & Occupancy | N/C |
| Rental of Crates, Pallets, Flat Trucks & Pallet Jacks | N/C |
| Cost of 316 Cartons and 28 Rolls Carton Tape | 325.72 |
| TOTAL EXPENSES @ 19TH & INDIANA | $13,236.72 |
| Labor @ Wm. F. Comly & Son including unloading inventory into warehouse, storing, sorting, tallying and Preparing for 2 Auction Sales | |
| Supervisory Labor 211 Hrs. @ $15.00 Per Hr. | $3,165.00 |
| Regular Labor 565 Hrs. @ $12.50 Per Hr. | 7,062.50 |
| Casual Labor 36 Hrs. @ $6.35 Per Hr. | 228.60 |
| TOTAL LABOR EXPENSES @ WM. F. COMLY & SON, INC. | $10,456.10 |
| TOTAL LABOR & EXPENSES | $23,692.82 |

Most of these expenses are documented with receipts, the exceptions being the forklift rental ($1,140) and the costs of cartons and tape ($325.72). However, all of the receipts bear dates between May 9, 1988, and June 11, 1988, indicating that they all pre-dated, by a considerable period of time, Comly's appointment as auctioneer on July 19, 1988. Time sheets are enclosed indicating that "casual labor," "regular labor," and "supervisory labor" was expended. Only the hours and names of the laborers are recited, with no description of their qualifications or of the duties performed. All of the labor was performed between May 4, 1988, and May 24, 1988, which of course considerably predated Comly's appointment.

It is therefore clear that, if we applied the standards of *Schwemmer Hardware* to this Application, all compensation would have to be denied to Comly. All of the services and costs preceded its appointment. Detail and documentation is spotty. Much of the expenses requested were for "labor," a category of costs which we specifically held, in *Schwemmer Hardware*, would be disallowed to an auctioneer.

However, we have additional, global conceptual problems with Comly's Application. We appointed Comly as an auctioneer to sell the Debtor's inventory, not as a mover or warehouser of the Debtor's inventory. The "expenses" authorized in our Order were obviously contemplated to be expenses normally associated with an auctioneer's engagement in an auction sale, such as advertising. Nothing in the Application nor in the Order provided the slightest hint that Comly was engaged to do extensive moving and warehousing of the Debtor's goods, particularly at a cost amounting to almost five times its commissions. We also question the need for the "supervisory labor," because the Trustee was, according to his Application, on site providing supervision.

Therefore, we would be justified in denying Comly all of the $31,588.02 in labor and expenses which it requests, and even its commissions.

However, we are reluctant to do this for several reasons. Firstly, the engagement preceded the announcement of our decision in *Schwemmer Hardware*. It is apparent to us that the standards to which auctioneers were held in making application to the estate for compensation, prior to *Schwemmer Hardware*, were apparently not clearly understood by local auctioneers. Secondly, the estate benefitted considerably from Comly's services. The proceeds realized from the sale of the inventory exceeded $68,000, far in excess of the sum which the Debtor, on its Schedules, measured at cost.[1] *See Joshua Slocum, supra.* Thirdly, Comly's Applications for appointment and for an award of compensation were filed by CFD, not by Comly itself. We are reluctant to penalize Comly too severely for shortcomings attributable solely to the Trustee's counsel, CFD. Finally, no party has objected to Comly's Application. *Id.*

We have therefore decided to allow Comly to recover its commissions of $4,924.21, plus a total sum of $10,000 as compensa-

---

1. The only other possibility is that the Debtor's counsel and/or the Debtor purposefully misled the court concerning the value of the inventory, something which we would never anticipate nor conclude without proof.

tion for all expenses. In rendering this "compromise" award, we must caution Comly, as well as all other auctioneers, that failure to properly obtain appointment, present documentation, and seek compensation for labor, particularly beyond the contemplated engagement as strictly an auctioneer, will not be tolerated after the date that *Schwemmer Hardware* was announced, irrespective of the attendant circumstances.

E. CFD WILL BE ALLOWED COMPENSATION FOR SERVICES AND REIMBURSEMENTS OF COSTS TOTALLING $6,521.42.

1. THE HOURLY RATE OF COMPENSATION OF CFD WILL LIMITED TO $125/HOUR.

Finally, we consider the Application of CFD itself as counsel for the Trustee. The first issue is whether the limitation of the hourly rate of the Trustee's compensation to $125 per hour is permissible. CFD argues that it is "inconceivable" that this court could "arbitrarily impose a limitation prior to services being rendered" and "can impose a limitation of $125.00 an hour as a standard rate to be applied in all bankruptcy cases." Brief of Ciardi, Fishbone, & DiDonato in Support of Counsel's Application for Compensation (hereinafter "CFD Brief"). It then suggests that this court is impermissible applying the pre-Code "strict rule of economy" rather than the factors outlined by the district court in *Rheam I*, see page 92 *supra*, in setting this figure. It concludes that it is "incomprehensible how a maximum hourly rate can be established by the court without consideration of these factors." *Id.* at 8.

There are several answers to these statements. Firstly, we carefully considered the factors of the difficulty of the tasks, the prevailing market rate, counsel's normal billing rate, and the rates awarded by

other courts in similar circumstances, as *Rheam I* directed, in setting the maximum rate of compensation chargeable by CFD for services in the instant case at $125/hour. Secondly, we did not establish $125/hour as the hourly rate in *all* bankruptcy cases, or even all Chapter 7 cases in which a Trustee requests appointment of counsel. In fact, we indicated an intention to award fees at rates up to $200/hour in certain circumstances in *In re Shaffer-Gordon Associates*, 68 B.R. 344, 346–47 (Bankr.E.D.Pa.1986), and we have adjusted that figure periodically upward to $225/hour.

We believe that we could, with some degree of accuracy, estimate the value of legal services necessary to administer this estate at $125/hour at the time that we appointed CFD as counsel. Nevertheless, we respect the district court's decision in *Rheam I* that we should not firmly establish a maximum rate that counsel will receive at the outset of case, before services are in fact rendered. However, on the other hand, we would consider ourselves to be disserving prospective trustee's counsel if we failed to advise counsel, at the outset of counsel's engagement, of our estimate of the value of its services, allowing it to guide itself accordingly in deciding whether to continue on with the engagement and, if it decides to continue, in determining what professionals to assign to performance of the tasks involved in administration of the estate.

We are now prepared to conclude that our prognosis of what the hourly rate of the Trustee's counsel in this case should be was accurate. The estate's legal problems produced but two contested matters, one of which was settled and the other of which, ably handled by Mr. Karalis, entailed litigation realizing a modest sum from the aged and ailing pro se former proprietor of the Debtor.[2] The legal problems were therefore extremely simple.

2. We note that the Trustee did not act upon our suggestion to attempt to recoup some of the $2,500 charged by the Debtor's counsel for his

services. If the Debtor's counsel had misled the court, see page 95 n. 1 *supra*, such action certainly would have been appropriate.

Clearly, they could have all been accomplished by Mr. Karalis, whose billing rate does not exceed $125/hr.[3] It is incumbent upon counsel to assign tasks to junior associates or paralegals when, like all of the tasks involved in administration of the instant estate, no higher level of experience or expertise is needed. *See, e.g., Ursic v. Bethlehem Mines,* 719 F.2d 670, 677 (3d Cir.1983) ("A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn.") *In re Wiedau's, Inc.,* 78 B.R. 904, 908–09 (Bankr.S.D.Ill.1987); and *In re Evans Products Co.,* 69 B.R. 68, 69 (Bankr.S.D.Fla.1986).

Consideration of the prevailing market rates as a factor in fixing an attorney's compensation suggests that some degree of standardization of rates of counsel for performing certain routine tasks is appropriate. We can conceive of no legal work as routine as administration of a Chapter 7 case with as little adversarial activity as this case. Establishment of benchmarks of rates for compensation appears to us to be a legitimate means of standardization of rates of counsel, a practice which has been widely encouraged. *See* Federal Courts Study Committee, *Tentative Recommendations for Public Comment,* 134–35 (December 22, 1989); Report of Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237, 260–62 (1985); and Federal Judicial Center, *Attorney Fee Petitions; Suggestions for Administration and Management* 43 (1985).[4]

We note, however, that we do not advocate, nor do we apply, a strict standardization of rates chargeable for any category of services. The epitome of strict standardization, which we do not practice, was probably the following formula of Chief Bankruptcy Judge Stewart of the Western District of Missouri, as described and criticized in *In re Air Freight Central,* 95 B.R. 114, 114 (W.D.Mo.1988):

> The top rate for trial work of attorneys with 10 years or more such experience was $115 per hour; the lowest rate for miscellaneous legal work of attorneys with less than 5 years of bankruptcy experience was $45 per hour.

 Exceptions to the $125/hour rate for Trustee's counsel in a typical Chapter 7 case, which is much more generous than that allowed to the most experienced practitioners for trial work under Chief Judge Stewart's formula, have been and will be made when the case presents unforeseen problems and/or counsel utilizes creative and exceptional lawyering skills. However, we believe that the instant case was not a case which presented unusual problems. The lawyering was reasonably competent, although deficiencies in the performance of services in the filing of Comly's Application resulted in denial of much of the compensation and reimbursement sought in that Application. For the most part, however, creative and exceptional lawyering was not called for by this case, nor was it provided.

The particular rate chosen is not below the "market rate" for rates established for trustees' counsel in cases reported nationally. *See Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088, 1091–92 (5th Cir.1980) (counsel awarded $100.00 per hour, in excess of counsel's previous maximum of $55.00 per hour, and his associates were awarded $55.00 per hour for special accomplishments); *In re Meade Land and Development Co., Inc.,* 577 F.2d 858, 859 (3d Cir. 1978) (counsel allowed rate of $100.00 per hour); *In re J. Gus Lallande, Inc.,* 79 B.R.

---

**3.** We also note that Mr. Karalis is a 1988 law school graduate and that the rates which he charges are, in this light, liberal.

**4.** By way of comparison, we note that the rates charged by practitioners for handling routine Chapter 13 cases has been standardized by most courts. *See In re Pendleton,* see 90.048338 Bankr. No. 88–13942F, slip op. at 8 (Bankr.E. D.Pa. January 10, 1990) (local range of fees for such matters generally capped at $1,000 to handle the entire case). *Compare* the rate caps established in other courts in *In re Taylor,* 100 B.R. 42, 46 (Bankr.D.Colo.1989) ($970); *In re Ashton,* 92 B.R. 254, 255 (Bankr.S.D.Ohio) ($650); *In re Richardson,* 89 B.R. 716 (Bankr.N. D.Ill.1988) ($750); and *In re Lopez Rodriquez,* 76 B.R. 252, 254 (Bankr.D.P.R.1987) ($600).

140, 141 (D.P.R.1987) (counsel awarded $90.00 per hour); *In re Garland Corp.*, 8 B.R. 826, 830, 835 (Bank. 1st Cir.1981) (counsel awarded $75.00 per hour for yeomen service in a large, difficult case); *In re Prairie Central Railway Co.*, 87 B.R. 952, 958 (Bankr.N.D.Ill.1988) (counsel awarded rates in range of $55.00 to $135.00 per hour); *In re Factory Tire Distributors, Inc.*, 71 B.R. 723, 727–28 (Bankr.W.D.Pa. 1987) (counsel awarded $75.00 per hour); *In re Schaeffer*, 71 B.R. 559, 563 (Bankr.S. D.Ohio 1987) (counsel awarded rates in range from $85.00 per hour to $100.00 per hour); *In re Taylor*, 66 B.R. 390, 394 (Bankr.W.D.Pa.1986) (counsel awarded fees at $95.00 hourly rate); *In re WHET, Inc.*, 58 B.R. 278, 286 (Bankr.D.Mass.1986) (counsel awarded hourly rate in range of $80.00 to $100.00 per hour in case involving significant difficulties due to the involvement of an infamous generator of litigation in the case, Anthony R. Martin–Trigona); and *In re Porter*, 52 B.R. 692, 701 (Bankr. E.D.Va.1985) (counsel allowed hourly rate of $100.00).

Nor is the hourly rate of $125/hour reflective of a misplaced "spirit of economy" in bankruptcy cases by this court, as the $125/hour rate is comparable to awards in local non-bankruptcy cases. *See Rode v. Dellarciprete*, 892 F.2d 1177, 1180–82 (3d Cir.1990) (counsel awarded rates of $90.00 and $125.00 per hour); *Northeast Women's Center v. McMonagle*, 889 F.2d 466, 469 (3d Cir.1989) (counsel awarded rates of $90.00 and $125.00 per hour in difficult and controversial case); *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 377 (3d Cir.1987) (rates between $100 and $125 per hour awarded in hotly-contested age-discrimination case); and *Swicker v. William Armstrong & Sons*, 484 F.Supp. 762, 772–72 (E.D.Pa.1980) (after collecting numerous cases allowing like rates, court awards counsel hourly rates of $60.00 and $40.00 per hour, respectively).

We therefore believe that the chosen rate of $125.00 per hour is in line with contemporary rates for a trustee's counsel in cases nationally, as well as the rates for counsel in local non-bankruptcy cases. We believe that such a rate is reflective of generous compensation for a job well done.

█ It has been suggested, in an article critiquing the application of the $125/hour rate allowed to counsel for Chapter 11 Trustees in *In re United Church of the Ministers of God* and *In re Heidnik*, Bankr. Nos. 87–01910S and 87–02045S, slip op. at 3–5, 1990 WL 5308 (Bankr.E.D.Pa. January 19, 1990), citing many of the same authorities,[5] that the rates recited in some of the foregoing cases were established several years ago, and may not reflect current market rates. M. Krasny & K. Carey, *A Potpourri of Recent "Unreported" Decisions*, 202 LEGAL INTELL. 948 (Feb. 9, 1990). As a general observation, it is true that hourly rates from older cases must be adjusted to account for inflation. We should consider, for example, the impact of inflation on the seemingly very modest rates quoted in 1980 in *Swicker*, an authority cited with approval by Judge Hutton in *Rheam I*, 98 B.R. at 194.

In applying the Consumer Price Index (hereinafter "CPI") to adjust the Equal Access to Justice Act cap rate of $75/hour, 28 U.S.C. § 2412(d)(2)(A)(ii), in *In re Armstead*, 106 B.R. 405, 417–18 (Bankr.E.D.Pa. 1989), we observed that, between October, 1981, and May, 1989, the CPI increased by 32.55 percent nationally and 34.49 percent in the Philadelphia area. Assuming even a high estimate of a 50 percent CPI increase between 1980 and 1990 would adjust the *Swicker* high and low rates in non-bankruptcy cases to only $90 and $60 per hour, respectively. The $125/hour figure would therefore not seem to be in any respect beneath the local market rate established in *Swicker*, even when adjustments for inflation are made.

---

5. We note that these cases, two Chapter 11 cases, *did* present, for the Trustee and their counsel, unusual tax and other legal problems and exposure to public scrutiny, and there was

intense opposition on several issues. Further, we found that the services there were well-performed. That case, therefore, would have clear-

We are not troubled by the fact that Mr. DiDonato, who performed certain services in this case, normally bills at a higher rate.[6] The courts, not counsel's own unchecked self-evaluation or the willingness of certain clients to pay high rates, must ultimately establish the limits on the rates which counsel may reasonably charge to a debtor's estate. *See Shaffer Gordon, supra,* 68 B.R. at 346–47. *Accord, In re Metro Transportation Co.,* 107 B.R. 50, 54 (E.D.Pa.1989) (per HUTTON, J.). *Cf. Daggett v. Kimmelman,* 811 F.2d 793, 799–800 (3d Cir.1987) (rate of $300–$375 per hour requested by counsel as a normal billing rate held properly reduced by district court to no more than $250/hour); and *Roe v. Operation Rescue,* C.A. No. 88–5157, 1990 WL 11620, 1990 U.S.Dist. LEXIS 1470, 4–5, 7 (E.D.Pa. Feb. 7, 1990) (counsel's hourly rates ranging from $240 to $75 hourly reduced to range from $156 to $48.75 hourly). While we have freely allowed Mr. DiDonato's hourly rate to be fixed at higher figures for services in more complex cases, we have reduced his rate to $125/hour in other instances. *See Beck–Rumbaugh, supra,* 68 B.R. at 888. As we indicated above, he should not be accorded rates befitting his status as a partner of a firm when he is, like here, performing services within the capacity of a junior associate. *See* page 96 *supra.*

We therefore conclude, upon consideration of all of the factors which Judge Hutton, in *Rheam I,* deemed significant—difficulty of the task, the prevailing market rate, counsel's normal billing rate, and the rates fixed by other courts in similar circumstances—that establishing the hourly rate for the services of CFD in this case at $125/hour is appropriate.[7]

**F. CFD WILL NOT BE ALLOWED TO RECEIVE COMPENSATION FROM THE DEBTOR'S ESTATE FOR SERVICES EXPENDED IN PROSECUTING ITS APPEALS OF OUR ORDERS OF FEBRUARY 10, 1988, AND APRIL 4, 1988, AS THOSE SERVICES DID NOT BENEFIT THE ESTATE.**

The next issue which we invited CFD to address in its Post–Audit–Hearing Brief is whether it was entitled to compensation from the estate for prosecuting its two separate appeals from our Orders of February 10, 1988, and April 4, 1988, respectively.

The taking of the February 10, 1988, appeal was of doubtful wisdom from the outset, given the defects recited at page 92 *supra.* These defects were apparently not subject to the degree of detection that they would have been had there been opposition on the appeal, and they were not detected. However, the wisdom of maintaining this appeal *after* CFD was subsequently appointed counsel was even more doubtful. The appeal was ultimately dismissed as moot *sua sponte* by Judge Gawthorp. The result served no benefit to anyone, neither to CFD nor certainly to the Debtor's estate.

We have reviewed the Briefs filed by CFD and the UST in the district court, as well as the Brief submitted to this court in support of CFD's claim for compensation for these efforts here, in order to attempt to understand the basis for CFD's persisting with this appeal even after its outcome was rendered moot. The argument of the UST appears to be that there was no precedent for the court's denial of counsel to the non-lawyer Trustee on demand, and, therefore, that this court not only should be, but

---

ly more readily justified an increment of the $125/hour rate than the instant case.

**6.** We noted, in *In re Beck–Rumbaugh Associates, Inc.,* 68 B.R. 882, 888 (Bankr.E.D.Pa.1987), *aff'd,* 84 B.R. 369 (E.D.Pa.1988), that Mr. DiDonato was serving as a law clerk for a judge of this court as late as 1981. Therefore, given his relatively short experience as a practicing lawyer, the rate which he has established, like that of Mr. Karalis, is not conservative.

**7.** We note that, of the several cases in which we established a $125/hour cap rate for counsel's services, only CFD has ever seen fit to appeal such orders, and to our knowledge has done so three times. We note that District Judge Thomas N. O'Neill, Jr. followed *Rheam I* in vacating a similar order in *In re Systems Industries, Inc.,* C.A. No. 89–0391 (E.D.Pa. April 18, 1989). However, District Judge Marvin Katz, in *In re Crisis Intervention Network, Inc.,* C.A. No. 89–1746 (E.D.Pa. April 10, 1989), dismissed a similar appeal *sua sponte* as interlocutory.

must be, considered as the rubber stamp of the will of the Trustee in this regard. The position of CFD appears to be that the authority cited by this court for denial of its appointment, *In re Pioneer Sample Book Co.*, 374 F.2d 953, 960–61 (3d Cir. 1967), was inapposite because, although the Court of Appeals, in *Pioneer Sample Book*, disapproved the retention of counsel in that case, the remedy provided was refusal to compensate counsel. Therefore, argues CFD, it "defies logic and reason" for this court to read *Pioneer Sample Book* as justifying denial of counsel, even in a no-asset case. CFD Brief, at 13. Rather, it contends, the court should express its disapproval of the appointment of counsel by disallowing counsel compensation. Cited in support of CFD's position are several cases where courts have addressed the issue of the right of a party to choose counsel. *See In re Christ's Church of the Golden Rule*, 165 F.2d 1007 (9th Cir.1948); *In re Heck's, Inc.*, 83 B.R. 410 (S.D.W.Va.1988); and *In re W.T. Grant Co.*, 4 B.R. 53, 82 (Bankr.S.D.N.Y.1980). Both parties further claim that this court's attempt to obtain an estimate of valuation of the Debtor's inventory from the Debtor's counsel was an improper *ex parte* communication.

We submit that the reasoning of both CFD and the UST was significantly flawed. Contrary to their apparent common position, we conclude that it is clearly *not* the function of a court to blindly appoint counsel first, upon request, and then ask questions or cut compensation later. Entry of an order appointing counsel is a judicial act, not to be exercised lightly. *See In re Arlan's Department Stores*, 615 F.2d 925, 932 (2d Cir.1979). It is never *presumed* that a request for counsel is justified. Rather, it is hornbook law that "[a]n attorney for the trustee should not be employed unless the attorney's special professional skills are necessary for the protection and benefit of the estate or for the furtherance of the aims of the case." 2 COLLIER ON BANKRUPTCY, ¶ 327.01, at 327-3 (15th ed. 1989).

Contrary to the UST's contention, we have located numerous reported cases in which an application of a trustee to have a court appoint counsel for the trustee has been denied, most frequently when, like the Application of CFD here, the request for appointment is couched in boilerplate language instead of alleging specific facts of the case in issue which justify appointment of counsel. *See In re Offutt*, 45 B.R. 80, 81–82 (Bankr.W.D.Ky.1984); and *In re Sylvania Area Investment Group, Inc.*, 35 B.R. 82, 83 (Bankr.N.D.Ohio 1983). *See also, e.g., In re Hironimus*, 26 B.R. 191, 192 (D.Colo.1983); *In re American Bantam Car Co.*, 103 F.Supp. 731, 732–33 (W.D.Pa.1952); *In re Bayless*, 78 B.R. 506, 512 (Bankr.S.D.Ohio 1987); and *In re Toliver*, 26 B.R. 103, 104 (Bankr.D.Colo.1982). *Cf. In re Kingsway Purchasing, Inc.*, 69 B.R. 713, 717 (Bankr.E.D.Mich.1987) (appointment of Secretary to the Creditors' Committee denied); and *In re Bible Speaks*, 67 B.R. 426 (Bankr.D.Mass.1986) (court limits Creditors' Committee to one counsel rather than co-counsel, as requested).

When the court is presented with only a generalized, boilerplate Application, as it was here, the court has no choice but to consult the Debtor's Schedules to determine whether appointment of counsel is appropriate. If the Schedules do not indicate any need for the appointment of counsel and the Trustee cannot clarify the Application or Schedules, upon request, the court has no point of reference except to consult the preparer of the Schedules, *i.e.*, the Debtor's counsel, for clarification. Since such Applications are presented and often granted *ex parte, see* Local Rule 9013.3(b)(6), the court should not be faulted for garnering facts relevant only to the Trustee's presumably non-adversarial application for appointment of counsel from the only possible source before the court places its imprimatur upon the Application. If the Schedules or other information supporting appointment of counsel are received by the court, despite deficiencies in the Application itself, counsel for the Trustee will be appointed *ex parte*. However, when, as in the instant case, no support appears, the Application must be denied.

The cases cited by CFD noted at page 99 *supra*, are irrelevant to the issue presented. The issue here was *not* whether, assuming that appointment of counsel was appropriate, CFD was an inappropriate choice of counsel. That was the sole issue presented by those cases. Normally, CFD has performed good quality work and we would not hesitate to appoint it *ex parte* as counsel for a trustee of an estate who needs counsel. However, the issue *here* was whether appointment of *any* counsel for the Trustee was appropriate. The body of cases cited by us at page 100 were therefore pertinent. We note that, once CFD filed an Application which included the requisite averments supporting its appointment, even if that Application did not answer our concerns expressed about the value of the Debtor's inventory, CFD was promptly appointed as the Trustee's counsel.

We cannot agree that *Pioneer Sample Book* expresses a preference for automatic appointment of counsel for the Trustee at the outset of a case and penalization of an inappropriate appointment only at the time of consideration of an application for compensation. Rather, we observe that, as an appellate court, the Court of Appeals, in *Pioneer Sample Book*, was powerless to undo the inappropriate appointment of counsel previously made by the bankruptcy court. *It* could *only* deny compensation at that point. *See also In re Sumthin' Special, Inc.*, 2 B.R. 743, 746–49 (N.D.Ill.1980) (court is extremely critical of unnecessary appointments of counsel by bankruptcy courts, but recognizes that, on appeal, all that it can do is greatly reduce inappropriately-appointed counsels' fee applications). We would expect that, as in the case of our estimate of the hourly fee to be allowed, counsel would appreciate being forewarned of the likelihood that compensation will be limited or denied at the outset of the case, rather than being led on by the court to believe that its appointment has the court's blessing only to be faced with denial of compensation after its time and efforts have been expended.

We therefore conclude that, with respect to the appeal of our Order of February 10, 1988, CFD and the UST were not only unreasonably persisting an appeal which had clearly been rendered moot, but they were also championing principles that cannot withstand rigorous analysis. The Debtor's estate should not equitably be burdened with the costs of CFD's pursuit of this matter.

■ We recognize that some of the obvious pitfalls of the appeal from our February 10, 1988, Order do not apply in assessing the appeal from our April 4, 1988, Order. The latter appeal, after all, was successful, in that the district court vacated the Order appealed. However, it must be questioned what practical good is derived from a court order which vacates a purely interlocutory order the effect of which this court, after thoroughly reassessing the matter, is prepared to reaffirm.

It is well-established that an appellate court lacks subject matter jurisdiction of an appeal from an order granting interim compensation. *See, e.g., In re Landmark Hotel & Casino, Inc.*, 872 F.2d 857, 860–62 (9th Cir.1989); *In re Stable Mews Associates*, 778 F.2d 121 (2d Cir.1985); *In re Grant Broadcasting of Philadelphia, Inc.*, C.A. No. 88–3974 (E.D.Pa. July 21, 1988); *In re St. Joseph's Hospital*, 102 B.R. 416, 421 (Bankr.E.D.Pa.1989); and 2 COLLIER, *supra*, ¶¶ 331.01, 313.03, at 331–2, 331–8, 331–10 to 331–11 & n. 4c and cases cited therein. Clearly, then, subject matter jurisdiction of an appeal from the April 4, 1988, Order, which is even farther removed from finality than an order of interim compensation, was likely to be lacking. District Judge Katz so concluded in *sua sponte* entering an order dismissing an identical appeal from an identical order in *Crisis Intervention Network, supra.*

Moreover, assuming, *arguendo*, that our Order of April 4, 1988, could be viewed as a potentially-appealable interlocutory order, we note that no requisite leave to appeal from this interlocutory order was requested or granted. *See* 28 U.S.C. § 158(a). Finally, further assuming *arguendo* that this order could be viewed as a final Order, we nevertheless observe that the appeal

was clearly taken in support of an attempt by CFD to enhance the amount of its compensation. Therefore, it ran afoul of the long-standing principle in this jurisdiction that time expended by professionals in pursuit of their or other professionals' fee applications cannot generally be compensated from funds of the debtor's estate. *See In re J.A. & L.C. Brown Co.*, 75 B.R. 539, 540 (E.D.Pa.1987); and *Shaffer–Gordon, supra,* 68 B.R. at 348–50. An exception to this rule is permissible in extraordinary situations, such as, in *Beck–Rumbaugh, supra,* 68 B.R. at 889, where opposing counsel is unreasonably obstreperous in opposing counsel's fee applications.

The nature of the proceedings in the instant case was, however, quite the opposite. No opposition was presented, and therefore CFD has been unopposed in utilizing this case as a battlefield for airing its differences with this court in consideration of fee applications and seeking to obtain compensation from the Debtor's estate to do so. Moreover, the victory attained in *Rheam I* was pyrrhic, as an analysis of the factors recited in that case as necessary for consideration have resulted in the same conclusion. *See* pages 96–100 *supra.*

The district court, in *Sumthin' Special, supra,* 2 B.R. at 749–51, was highly critical of bankruptcy judges which it perceived as responsible for awarding excessive fees. Taking this criticism to heart, we cannot allow CFD to recover any more than $6,531.42 of the fees and costs which it seeks. We note that all specific disallowances of compensation reimbursement, within the general principles outlined in this Opinion, are noted directly upon CFD's Application for compensation.

## G. CONCLUSION

An Order, allowing compensation in the amounts deemed appropriate in this Opinion, and directing the Trustee and CFD to file the necessary papers to complete administration of this case shortly hereafter will be entered.

### ORDER

AND NOW, this 26th day of February, 1990, after a colloquy with the Trustee and his counsel at a Final Audit Hearing of January 11, 1990, and upon consideration of the Applications for Compensation and Supplements thereto and the Briefs of counsel filed pursuant to our Order of January 17, 1990, it is hereby ORDERED AND DECREED as follows:

1. The Trustee, ANTHONY BARONE, is allowed commissions of $2,386.02.

2. The Trustee's Auctioneer, WILLIAM F. COMLY & SONS, Inc., is allowed commissions of $4,924.21 and reimbursement of expenses of $10,000.00.

3. The Trustee's Counsel, CIARDI, FISHBONE, AND DiDONATO, is allowed compensation of $6,488.00 and reimbursement of expenses of $33.42.

4. The Trustee or his counsel shall submit a proposed Order for Distribution consistent with this Order on or before April 1, 1990.

5. The Trustee or his counsel shall thereafter file the cancelled checks and zero bank statement; or an affidavit, pertaining to disbursements made pursuant to the Order of Final Distribution, setting forth that there is a zero balance in the account, or that the cancelled checks are no longer available, on or before June 1, 1990.