**In re RHEAM OF INDIANA, INC., Debtor.**

**Bankruptcy No. 87–06459S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 27, 1992.

Dominic Pacitti, Lesser & Kaplin, P.C., Blue Bell, Pa., for F. Comly & Son, Inc.

Anthony Barone, Philadelphia, Pa., trustee.

Edward J. DiDonato, Ciardi, Fishbone & DiDonato, Philadelphia, Pa., for trustee.

W.J. Winterstein, Jr., Rawle & Henderson, Philadelphia, Pa., for debtor.

Frederic Baker, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Once again, the proceedings in this apparently modest-sized and simple corporate Chapter 7 bankruptcy case require the preparation of a written Opinion, adding to the two district court Opinions published at 133 B.R. 325 (*"Rheam III"*) (GAWTHROP, J.), and 98 B.R. 193 (*"Rheam I"*) (HUTTON, J.), respectively, and one of our own published at 111 B.R. 87 (*"Rheam II"*). On remand from *Rheam III* on this issue, 133 B.R. at 336–39, we determine that the auctioneer belatedly appointed on behalf of the estate, William F. Comly & Son, Inc. ("Comly"), cannot recover any compensation for his services, as it has not met the rigorous criteria for *nunc pro tunc* appointment set forth in *In re F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 105–09 (3d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); and *In re Arkansas Co.*, 798 F.2d 645, 649–51 (3d Cir.1986).

As no objection to Comly's appointment *nunc pro tunc* was asserted by any interested party, we also address the now-controversial issue of whether it is appropriate for us to review fee applications *sua sponte*. *Compare Rheam III*, 133 B.R. at 330–33 (*sua sponte* reduction is appropriate), *with In re T & D Tool & Die, Inc.*, 132 B.R. 525, 528 n. 1 (E.D.Pa.1991) (HUTTON, J.) (*"T & D II"*); and *In re Jensen's Interiors, Inc.*, 132 B.R. 105, 106 (E.D.Pa.1991) (NEWCOMER, S.J.) (*sua sponte* reduction is impermissible). We reiterate our right and duty to review such applications *sua sponte* in ruling against Comly.

### B. PROCEDURAL AND FACTUAL HISTORY

In *Rheam II*, allowing Comly certain dispensations from the standards established for applications for compensation by auctioneers in *In re Schwemmer Hardware Co.*, 103 B.R. 635, 638–42 (Bankr.E.D.Pa. 1989), we awarded Comly its requested commissions of $4,924.21, but only $10,000 of a total of $26,663.81 requested for costs. 111 B.R. at 93–96. The district court, in *Rheam III*, 133 B.R. at 338, observed that our decisions allowing part of the compensation requested by Comly was exactly the sort of compromise ("Solomonic slicing") based upon a recognition of hardship and measure of the benefit of the belatedly-appointed professional's circumstances which was expressly prohibited by the holdings in *Airlease*, 844 F.2d at 108; and *Arkansas*, 798 F.2d at 649. Therefore, it remanded this issue to us to determine whether the requisite "extraordinary circumstances" justifying Comly's *nunc pro tunc* appointment could be met here. 133 B.R. at 338.

Upon receipt of the record in this case from the district court, we issued an Order of November 26, 1991, requiring Comly to file any motion seeking *nunc pro tunc* appointment on or before December 5, 1991. A hearing on any such motion filed was scheduled on December 19, 1991.

A motion having been filed, the hearing was conducted on December 19, 1991. At the outset, in the absence of any objections thereto, we offered Comly the opportunity to accept the $14,924.21 awarded to it in *Rheam II* as a settlement. This offer was refused. Comly then called its only witness, Stephen Edward Comly ("Stephen"),

Comly's vice-president. Counsel for the Trustee supported the motion because of the "excellent job" performed for the estate by Comly, but did not specifically address the legal issues regarding *nunc pro tunc* appointments which the district court, in *Rheam III*, mandated us to consider. An Assistant United States Trustee ("the UST") appeared, but left "to another jurisdiction" prior to taking of testimony, stating that Comly must show "exceptional circumstances" to succeed in its motion, but not expressing any opinion as to whether he thought that such circumstances were present here. After the hearing, we granted Comly's counsel an opportunity to file a Brief supporting his client's position on or before January 10, 1992.

The facts pertinent to this matter, although recited in detail *Rheam III*, 133 B.R. at 329–30; and *Rheam II*, 111 B.R. at 90–91, are reiterated herein where relevant to the instant motion and, where pertinent, are embellished by the testimony of Stephen at the hearing.

RHEAM OF INDIANA, INC. ("the Debtor") filed a Chapter 7 petition on December 29, 1987. The UST appointed Anthony Barone, a non-attorney ("the Trustee"), as trustee. The Debtor, prior to its bankruptcy filing, operated a retail housewares and hardware concession in a large indoor shopping facility located at 19th Street and Indiana Avenue in Philadelphia, which is situated in the heart of economically-depressed North Philadelphia. The Debtor's bankruptcy was engendered by the facility's loss of its food-store concession, which led to the closing of the entire facility and the Debtor's portion of it.

On April 24, 1988, Plant Realty Co. ("Plant"), the owner of the premises where the facility was located, filed a motion in this court to, *inter alia*, compel the removal of the Debtor's property from its premises. After a colloquy with counsel, we denied the motion, but without prejudice to Plant to pursue what the court believed was the proper procedure, *i.e.*, a motion for relief from the automatic stay, which we agreed to list on May 11, 1988.

Prior to the hearing of May 11, 1988, Plant and the Trustee reached an agreement, approved by this court on May 13, 1988, pursuant to which Plant agreed to waive all pre-petition and administrative claims against the estate, estimated at $15,000, in exchange for the Trustee's agreement to "retain the services of [Comly] to remove all of [the Debtor's] property from the present location."

On April 20, 1988, the Trustee, through his counsel, had filed an application seeking appointment of Comly as auctioneer for the estate. However, it was not until July 18, 1988, that the Trustee filed a certification of no objection to his application to employ Comly. On July 19, 1988, this court approved the application which stated, in pertinent part, as follows:

It is ORDERED that William Comly and Son, Inc. be appointed as auctioneer, under the terms included in the foregoing Motion, to sell the inventory of the Debtor consisting of hardware, housewares, toys and linens at a public sale and shall receive a commission at the following rates plus expenses:

10% of the first $10,000.00
7.5% of the next $40,000.00;
5% of the next $50,000.00;
3% of the next $100,000.00; and
1% on all amounts above $200,000.00 realized from the sale.

On May 4, 1988, Comly began the task of moving the Debtor's inventory from Plant's premises and transporting the goods to the third floor of Comly's own offices and warehouse near the intersection of Front Street and Kensington Avenue in Philadelphia. This situs, in the Kensington area of Philadelphia, is also an economically-depressed area of the City.

The moving was completed by May 24, 1988. Comly conducted three auctions, on May 24, 1988; May 31, 1988; and on June 14, 1988, disposing of all of Rheam's inventory. The auctions grossed $68,484.18, which was much more than even the Debtor valued its inventory on its Schedules.

Comly did not file an Application for compensation until October 4, 1989. No

itemization of the costs was included other than a statement that Comly's commissions were $4,921.24; its "labor expense" was $23,692.82; and its "advertisement costs" were $2,970.99, a total of $31,585.05. This Application was initially considered by this court at a Final Audit Hearing in the case on January 11, 1990. After that hearing, we entered an Order of January 17, 1990, requiring, *inter alia,* Comly to submit an Amended Application in conformity with *Schwemmer Hardware, supra,* on or before February 12, 1990.

On February 12, 1990, Comly filed a Supplemental Application which described the scope of the services performed, attached receipts for many of the expenses, and identified the laborers employed at the hourly rates of $15.00 for supervisory labor, $12.50 for regular labor, and $6.35 for "casual" labor. A summary of its "labor expense" was submitted as follows:

### Kelly Korner Labor & Expenses @ 19th & Indiana

| | |
|---|---|
| Casual Labor 5/4 to 6/4 560 Hrs. @ $6.35 Per Hr. | $3,556.00 |
| Jim Horbury Supervisor 21 Man Days @ $125.00 Per Day | 2,625.00 |
| Labor to Clean Up Premises (Independent Contractor) | 1,300.00 |
| Trash Removal Service (Independent Contractor) | 2,200.00 |
| Forklift Rental 4 Weeks @ $285.00 Per Week | 1,140.00 |
| Trucking (15 loads) from 19th & Indiana To Comly & Son | 2,090.00 |
| Warehouse Use & Occupancy | N/C |
| Rental of Crates, Pallets, Flat Trucks & Pallet Jacks | N/C |
| Cost of 316 Cartons and 28 Rolls Carton Tape | 325.72 |

TOTAL EXPENSES @ 19TH & INDIANA $13,236.72

Labor @ Wm. F. Comly & Son including unloading inventory into warehouse, storing, sorting, tallying and Preparing for 2 Auction Sales

| | |
|---|---|
| Supervisory Labor 211 Hrs. @ $15.00 Per Hr. | $3,165.00 |
| Regular Labor 565 Hrs. @ $12.50 Per Hr. | 7,062.50 |
| Casual Labor 36 Hrs. @ $6.35 Per Hr. | 228.60 |

TOTAL LABOR EXPENSES @ WM. F. COMLY & SON, Inc. $10,456.10
TOTAL LABOR & EXPENSES $23,692.82

---

Although Comly and the Trustee both emphasized the necessity and benefit to the estate from Comly's labors, a careful review of the pertinent figures places these assertions in doubt. The principal benefit in moving the Debtor's inventory was to eliminate a $15,000 claim of Plant. The labor costs of Comly exceeded this figure by over fifty (50%) percent. While some labor costs may have attended a sale at the Debtor's site, Stephen testified that much of the labor was expended on dismantling the Debtor's fixtures at Plant's premises and reassembling them in the Comly's facility. The court is not convinced that moving the Debtor's inventory from a recognized store-site in one depressed neighborhood to a new site in another depressed neighborhood enhanced the proceeds of the sale. The figure realized at the auctions seemed quite substantial. However, even more may have been realized had the inventory been sold on site. Insofar as Plant's aggressive advocacy was a factor, it should be recalled that this court held Plant at bay at the hearing of April 24, 1988, and displayed no indication to do otherwise in the future as long as the Trustee expeditiously proceeded to sell the Debtor's inventory.

Stephen further testified that Comly had been in business since 1980, and that it frequently performed services in bankruptcy cases in this court and in New Jersey. He did not deny that Comly was aware that it must be appointed by the bankruptcy court as a condition of receipt of compensation for its services in a bankruptcy case. However, he stated that it was nevertheless Comly's practice to leave such matters in the hands of counsel for the Trustee. He also stated that Comly had done work for Trustee Barone in the past; that he knew that the Trustee was not himself an attorney; and that, when initially contacted by the Trustee, Stephen knew that the Trustee was not represented.

## C. DISCUSSION/CONCLUSIONS OF LAW

### 1. THIS COURT REITERATES ITS POWER AND DUTY TO REVIEW ALL FEE APPLICATIONS SUA SPONTE.

In *Rheam I*, the district court, per HUTTON, J., 98 B.R. at 194, held that it was an error for this court to pre-establish a limit of $125 per hour as the rate of compensation of the Trustee's counsel. In *Rheam II*, 111 B.R. at 96–99, adhering to the mandate of *Rheam I* that we must carefully review the difficulty of the tasks, the prevailing market rate, counsel's normal billing rate, and the rates awarded by other courts in similar circumstances, we reiterated that $125 per hour was an appropriate hourly rate for services by the Trustee's counsel in this case. This result was not disturbed in *Rheam III*, 133 B.R. at 333–35, and no further appeal was taken by the Trustee's counsel, rendering the disposition of the compensation of the Trustee's counsel at $6,521.41 in *Rheam II* final.

There is no question that we are compelled to adhere carefully to all aspects of the mandate of the district court in *Rheam III* in rendering this decision on remand regarding Comly's compensation. *See Taylor v. United States*, 815 F.2d 249, 252 (3d Cir.1987); *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir.1985); and *Seese v. Volkswagenwerk, A.G.*, 679 F.2d 336, 337 (3d Cir.1982). Therefore, there is a little question that, despite the absence of opposition to the instant motion, we must adhere to the directives of the district court that we must review the issue of whether *nunc pro tunc* appointment of Comly is proper, 133 B.R. at 338, 339, and that it is appropriate for us to review this application for compensation *sua sponte*, 133 B.R. at 330–33, even though the latter holding was issued in the context of the application of the Trustee's counsel for compensation rather than in the context of the application of Comly.

However, because of the wide publicity given to the *Jensen* decision and the curiosity of the bar as to how this court will react to it, *see* M. Krasny & K. Carey, *Confusion Continues About Fee Review*, Legal Intelligencer, October 25, 1991, at 3, col. 1 (*"Krasny & Carey I"*); and M. Krasny & K. Carey, *No Sua Sponte Reduction of Compensation*, Legal Intelligencer, October, 1991, at 3, col. 1, we believe that some further commentary on this issue is warranted.

It has been and continues to be our practice to review every one of the thousands of fee applications filed in this court annually, whether an objection is raised or not and whether a hearing is scheduled or not. Given the crowd of matters on our calendar, hearings are scheduled only if there is an objection filed or if the court has particular questions about an application. We consider these practices to be necessary to prevent our calendar from being overwhelmed by fee applications and because this procedure is consistent with all known authority. *See Blum v. Witco Chemical Corp.*, 829 F.2d 367, 377–78 (3d Cir.1987); *In re Metro Transportation Co.*, 107 B.R. 50, 53–54 (E.D.Pa.1989) (HUTTON, J.); *In re Pothoven*, 84 B.R. 579, 582–83 (Bankr.S.D.Iowa 1988) (en banc); and *In re Pettibone Corp.*, 74 B.R. 293, 300 (Bankr.N.D.Ill.1987). To the extent that *Jensen* suggests to the contrary, we do not intend to follow it.[1]

**1.** One of the ironies of the *Jensen* proceedings is  that, contrary to the district court's assumption,

The statements of the *Rheam* court regarding the power and duty of this court to review fee applications *sua sponte* were consistent with our own statements, as follows, in *In re Leedy Mortgage Co.*, 126 B.R. 907, 915–16 (Bankr.E.D.Pa.1991):

> it is apparent that the UST's office is too overburdened with other duties to devote significant resources to this task. Moreover, the UST is well aware that this court "must ... be prepared to accept responsibility for its judicial actions by independently determining that court authorization of the fee payment is warranted." *In re Metro Transportation Co.*, 107 B.R. 50, 53 (E.D. Pa.1989). Therefore, as a matter of structuring his priorities, the [UST] explained that the UST has left this area largely to the court. We must pick up this slack if compromise of the integrity of the system is to be avoided. *Cf. [In re] Philadelphia Mortgage Trust*, ... 930 F.2d [306,] 309 [ (3d Cir.1991) ] ("Congress chose to require court approval [for the trustee's employment of an attorney, accountant, or other professional] in order to eliminate abuses and detrimental practices such as cronyism of the 'bankruptcy ring' [and attorney control of bankruptcy cases, Furthermore, prior court approval serves to preserve the bankruptcy estate by preventing unnecessary professional excursions].").

We further proceeded, in *Leedy Mortgage*, quoting *In re Patronek*, 121 B.R. 728, 730 n. 4 (Bankr.E.D.Pa.1990), to cite the long line of authority in this district supporting this conclusion:

> an Objection to counsel's fee *was* asserted by the UST at the hearing scheduled on the subsequently-withdrawn Objection of a creditor. In fact, the UST argued vociferously that *Jensen* counsel's fees should be reduced to $750. This court awarded $2,000 as a compromise. Unfortunately, the UST chose not to participate in the appeal, and *Jensen*'s counsel chose not to provide the district court with a copy of the transcript of the hearing in this court. The district court thereupon proceeded to require us to award *Jensen*'s counsel the full $4,263.50 which he sought.
>
> These facts suggest to us that the one-sided nature of almost all fee applications and appeals requires particular court attention to such matters.

"[p]rior to the *Pendleton* order, it had been universally held, in this jurisdiction, that fee applications in bankruptcy cases, being the archetype of 'fund-in-court' cases, are subject to court review even if there is no objection by any other party. *See, e.g., In re Reader*, No. 87–03701, Memorandum Opinion, slip op. at 203 [845 F.2d 1014 (Table) ] (3d Cir. March 10, 1988); *In re Metro Transportation Co.*, 107 B.R. 50, 53–54 (Bankr.E.D.Pa. 1989); *In re National Paragon Corp.*, 87 B.R. 11, 13 (Bankr.E.D.Pa.1988); and *In re J.A. & L.C. Brown, Inc.*, 75 B.R. 539, 539–40 (Bankr.E.D.Pa.1987). *See generally* Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 255 (1985) ("the court must ... monitor the disbursements of the fund and act as fiduciary for those who are supposed to benefit from it.")."

*Id. See also In re Meade Land & Development Co.*, 527 F.2d 280, 284 (3d Cir.1975) ("it is the court's independent obligation to give credit only where there are ... supporting documents, even in cases where no interested parties raise objections").[2]

We also noted, in *Leedy Mortgage*, 126 B.R. at 915–16, that courts in other jurisdictions concurred with our conclusion that a bankruptcy judge *always* retains the power and duty to review fee applications before the judge executed an order allowing compensation from a debtor's estate. After conducting additional research, we have not located *any* case in *any* other jurisdiction which supported the conclusion

2. Because bankruptcy cases are "fund-in-court" rather than "statutory fee" cases, such "statutory fee" cases as *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 719 (3d Cir.1989); and *Cunningham v. City of McKeesport*, 753 F.2d 262 (3d Cir.1985), do *not* support the "*Jensen* doctrine." *In re Fleet*, C.A. No. 89–7527, 1990 WL 18926 (E.D.Pa.Feb. 23, 1990) (FULLAM, CH. J.), is often erroneously cited as supporting the "*Jensen*" doctrine. It does not. Although the *Fleet* matter was a successful appeal of an attorneys' fee award which arose in a bankruptcy case, it was a "statutory fee" case in which the defendants, not a debtor's estate, were ordered to pay the attorneys' fees. *See In re Fleet*, 95 B.R. 319, 336–37 (E.D.Pa.1989).

reached in *Jensen* that a bankruptcy judge is totally powerless to alter an unobjected request for compensation. Decisions from a multitude of different jurisdictions which hold that the bankruptcy court always retains the power and duty to review fee applications *sua sponte,* even in the absence of objections are, meanwhile, legion. *See In re NRG Resources, Inc.,* 64 B.R. 643, 650 (W.D.La.1986); *In re Bush,* 131 B.R. 364, 365 (Bankr.W.D.Mich.1991); *In re Gold Seal Products Co.,* 128 B.R. 822, 827–28 (Bankr.N.D.Ala.1991); *In re Car Hauler Specialist, Inc.,* 128 B.R. 325, 326 (Bankr.N.D.N.Y.1990); *In re Stoecker,* 128 B.R. 205, 208 (Bankr.N.D.Ill.1991); *In re Concept Clubs, Inc.,* 125 B.R. 634, 636 (Bankr.D.Utah 1991); *In re Saunders,* 124 B.R. 234, 236 (Bankr.W.D.Tex.1991); *In re Sounds Distributing Corp.,* 122 B.R. 952, 957 (Bankr.W.D.Pa.1991); *In re CVC, Inc.,* 120 B.R. 874, 876–77 (Bankr.N.D.Ohio 1990); *In re Great Sweats, Inc.,* 113 B.R. 240, 242 (Bankr.E.D.Va.1990); *In re Gary Fairbanks, Inc.,* 111 B.R. 809, 811 (Bankr. N.D.Iowa 1990); *In re Oberreich,* 109 B.R. 936, 937 (Bankr.D.Wis.1990); *In re Inslaw, Inc.,* 106 B.R. 331, 333 (Bankr.D.D.C.1989); *In re Convent Guardian Corp.,* 103 B.R. 937, 939 (Bankr.N.D.Ill.1989); *In re Hogg,* 103 B.R. 207, 209 (Bankr.D.S.D.1988); *In re Miami Optical Export, Inc.,* 101 B.R. 383, 384 (Bankr.S.D.Fla.1989); *In re Westside Creek Limited Partnership,* 93 B.R. 177, 179 (Bankr.E.D.Ark.1988); *In re Gulf Consolidated Services, Inc.,* 91 B.R. 414, 415 (Bankr.S.D.Tex.1988); *In re Kriedle,* 85 B.R. 573, 574 (Bankr.D.Colo.1988); *Pothoven, supra,* 84 B.R. at 584–85 (en banc); *In re S.T.N. Enterprises, Inc.,* 70 B.R. 823, 831–32 (Bankr.D.Vt.1987); *In re Mansfield Tire & Rubber Co.,* 65 B.R. 446, 455 (Bankr.N.D.Ohio 1986); *In re Affinito & Son, Inc.,* 63 B.R. 495, 497 (Bankr.W.D.Pa. 1986); *In re Esar Ventures, Inc.,* 62 B.R. 204, 205 (Bankr.D.Hawaii 1986); *In re Cuisine Magazine, Inc.,* 61 B.R. 210, 219 (Bankr.S.D.N.Y.1986); *In re N.S. Garrott & Sons,* 54 B.R. 221, 222 (Bankr.E.D.Ark. 1985); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 585 (Bankr.D.Utah 1985); *In re Thomas, Inc.,* 43 B.R. 510, 511 (Bankr. D.Mass.1984); *In re Wilson Foods Corp.,* 36 B.R. 317, 320 (Bankr.W.D.Okla.1984); *In re Watson Seafood & Poultry Co.,* 40 B.R. 436, 438 (Bankr.E.D.N.C.1984); *In re Liberal Market, Inc.,* 24 B.R. 653, 657 (Bankr.S.D.Ohio 1982); *In re Crutcher Transfer Line, Inc.,* 20 B.R. 705, 710 (Bankr.W.D.Ky.1982); *In re Hamilton Hardware Co.,* 11 B.R. 326, 329 (Bankr. E.D.Mich.1981); and *In re St. Pierre,* 4 B.R. 184, 185 (Bankr.D.R.I.1980).

It is apparent that many of these decisions post-dated the establishment of the UST system in nearly every jurisdiction as of 1986, and many arose in jurisdictions where the UST system was in place prior to 1986. Therefore, it is manifestly clear that, except for the *Jensen* and its progeny, no other court has concluded that a bankruptcy judge's duty to review fee applications is pre-empted or otherwise affected by the presence of the UST.[3]

It is probably apparent that, with *Rheam III* now being the most recent pronouncement of our local district court on the subject, this court is not obliged to follow *Jensen* and its progeny in any future cases. *See In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 106 n. 1 (Bankr.E.D.Pa.1991) (the decision of a single judge in a multijudge district court is not the "law of the district," *Threadgill v. Armstrong World Industries, Inc.,* 928 F.2d 1366, 1371–72 (3d Cir.1991), especially when the decision of another judge in the same district is to the contrary). However, we note that Judge Hutton of our district court, who previously stated directly to the contrary in *Metro Transportation, supra,* 107 B.R. at 53, 54, recently related (without citing *Rheam*), that he "agrees with [*Jensen* ] that a bankruptcy court does not have the power to *sua sponte* reduce the fees requested by counsel absent an objection to those fees by an party in interest." *T & D II, supra,*

---

**3.** The limited participation by the UST at the hearing of December 19, 1991, in this matter on remand further attests to our statements in *Leedy Mortgage* that, at least in this jurisdiction, the UST has left the area of review of fee applications almost exclusively to this court.

132 B.R. at 528 N. 1.[4] We therefore have a legitimate concern that the *"Jensen* doctrine," though contrary to all known authority elsewhere, may spread locally if its lack of support elsewhere is not exposed.

The dilemma in which the current state of affairs places this court is exemplified by an Order of our colleague, Judge Fox, in *In re Thomas,* Bankr. No. 91–11790F (Bankr.E.D.Pa.Oct. 15, 1991), discussed in *Krasny & Carey I, supra.* In *Thomas,* Judge Fox pointed out that 11 U.S.C. § 330(a) of the Bankruptcy Code has traditionally been interpreted as imposing a duty upon bankruptcy judges to review fee applications, irrespective of the presence of objections thereto. However, if a judge reduces an application *sua sponte* and an appeal follows, and the matter is assigned to certain district judges, a summary reversal may occur. Therefore, Judge Fox granted the application in issue in *Thomas,* while expressly making no findings under § 330(a). Obviously, this is a response to *Jensen* and its progeny which will minimize the potential floodgate of appeals which may result if we follow *Rheam III* and reduce fee applications *sua sponte,* and counsel whose compensation is reduced chooses to "roll the dice" in the hope that counsel might obtain appellate review by a district judge prepared to follow *Jensen.*

Fee matters, like all matters involving money, tend to focus on the bottom line. It is this aspect of fee-application reductions that make them so difficult for the bar to approach objectively. Moreover, a bankruptcy judge approaches such applications with the knowledge that, in most cases, reductions will represent a "loss" to professionals seeking compensation with no corresponding "winner." It is natural for the applicant to feel some resentment towards the judge who carefully reviews and thereafter reduces a fee application. It is difficult to imagine a more thankless and therefore unpleasant task.

However, this task must be approached with appreciation that no less than public confidence in the bankruptcy system is at stake. Many creditors and interested parties have too small a stake in cases to hire counsel to file and prosecute objections to fee applications. We suspect that many of these parties assume that, since a judge must sign a fee application order, the judge must review the matter first before signing. This very logical assumption should not be proven inaccurate.

Our review of stories which appear in the general news media suggests to us that the public suspects that bankruptcy courts are, if anything, far too liberal in awarding compensation for services, particularly when such services are not perceived as bettering either the parties to the litigation or society in general. *See Philadelphia Mortgage Trust, supra,* 930 F.2d at 309 (Court of Appeals voices concerns about cronyism between the "bankruptcy ring" and the court). Removal of the review process of the bankruptcy judge, weighing a fee request, in the context of the thousands the judge has seen, cannot have any effect but to justifiably undermine public confidence in the legitimacy of the entire bankruptcy process.

There is, of course, a tremendous temptation for a bankruptcy judge, presented

---

**4.** In entering this Order, Judge Hutton awarded an additional $150 to counsel for the debtor in a case which, like *Jensen,* was a Chapter 11 case which quickly manifested failure and was converted to Chapter 7. Ironically, Judge Hutton had earlier affirmed this court's *sua sponte* reduction of several thousand dollars of requested fees because counsel failed to obtain prior appointment by the court. *See In re T & D Tool & Dye, Inc.,* 125 B.R. 116 (Bankr.E.D.Pa.1991) ("*T & D I*").

The spread of the *"Jensen* doctrine" is reflected in *In re Conston Corp.,* C.A. No. 91–7176, 1992 WL 55694 (E.D.Pa. Jan. 6, 1992), in which Judge Hutton directed this court to enter an order allowing the Debtor's counsel every penny of $368,440.34 sought in a final application, even though counsel quoted a top hourly rate of $325, far above the top rate of any other firm in this jurisdiction, in a large but not particularly problematic case.

We also note that *Jensen* cannot be distinguished from *T & D I* on the ground that it involved only reduction of fees after counsel was appointed. A portion of the fees disallowed by this court and restored in *Jensen* were services rendered pre-petition and therefore prior to counsel's appointment. *See In re St. Joseph's Hospital,* 102 B.R. 416, 417–18, 419–20 (Bankr. E.D.Pa.1989).

with a decision such as *Jensen*, to conclude that the many hours spent reviewing fee application could be spent on more pleasant and personally rewarding pursuits. *See* G. Bermant, P. Lombard, & E. Wiggins, *A Day in the Life: The Federal Judicial Center's 1988–1989 Bankruptcy Court Time Study*, 65 AM. BANKR. L.J. 491, 513–14 (1991) (a significant percentage of judicial time of bankruptcy judges nationally is spent reviewing fee applications). It is certainly frustrating to be rewarded for the time spent on this thankless task by being told that it was improper to expend that time in the first place.

However, it is not the intention of this court to take this apparent easy escape route. We believe that not only are *Jensen* and its progeny mistaken in their legal reasoning, but also that the issue at hand threatens the integrity of the entire bankruptcy system. This court will therefore continue to review fee applications, even though, at this juncture, the UST and interested parties rarely, if ever, object to even the few egregious examples of overreaching among the thousands of applications presented.

This court therefore reiterates its belief that it has the power and the duty to not only follow the mandates of *Rheam III* in reviewing Comly's unopposed motion for appointment *nunc pro tunc*, but to make such reviews in all other fee applications brought before us in the future.

## 2. COMLY HAS FAILED TO ESTABLISH THE REQUISITE "EXTRAORDINARY CIRCUMSTANCES" NECESSARY TO ALLOW IT TO BE APPOINTED AS A PROFESSIONAL PARTY NUNC PRO TUNC.

The Bankruptcy Code, at 11 U.S.C. § 327(a), requires that employment of professionals in a bankruptcy case must be pre-approved by the bankruptcy court. That Code section reads as follows:

Except as otherwise provided in this section, the trustee, *with the court's approval*, may employ one or more attorneys, accountants, appraisers, *auction-*eers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title (emphasis added).

Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 2014(a) thusly further provides that a trustee is authorized to apply to the court for the employment of professional persons:

An order approving the employment of attorneys, accountants, appraisers, *auctioneers*, agents or other professionals pursuant to § 327 or § 1103 of the Code shall be made only on application of the trustee ..., stating the specific facts showing the necessity for the employment ... (emphasis added).

The Trustee, though his counsel, applied to the court for employment of Comly on April 20, 1988. Local Bankruptcy Rules ("LBR") 9013.3(c)(2) and (d) require that the proponent of an application to appoint a professional other than counsel for a debtor-in-possession or an official creditors' committee may, five days after service, file a certification that no objection to the entry of the order has been filed. LBR 9013.-3(d)(1). Such an Order may be signed by the court seven days after filing. LBR 9013.3(d)(3). However, it was not until July 18, 1988, almost 90 days after the application to appoint Comly was filed on April 20, 1988, that the Trustee's counsel did in fact file a certificate of no objection to the application to appoint Comly as auctioneer. The following day, July 19, 1988, this court approved the application for employment. Unfortunately, Comly's entire fee application seeks compensation for services completed prior to approval of its appointment by the bankruptcy court. Any delay in acquiring approval for Comly's employment was due to the failure of the Trustee's counsel to proceed promptly under the LBR's. The court approved the application immediately upon receiving the appropriate certification.

We note that, in many instances, we have considered an application effective as of the date that it was filed, on the theory

that a professional should not be penalized for the court's own delays in acting on such an application. However, here, the delay was not attributable to the court, and the delay was so egregious that *all* of the substantial services of the professional were *completed* prior to its appointment. Moreover, the district court, in *Rheam III*, has already held, citing *Airlease, supra*, 844 F.2d at 107, "that professionals must obtain approval, and not merely seek approval, before performing services for an estate, absent extraordinary circumstances." 133 B.R. at 327. This holding is part of the mandate of the district court in *Rheam III* which we are bound to follow. *Compare T & D II, supra*, 132 B.R. at 526 (district court affirms decision holding appointment effective as of date of application, since the court appeared responsible for the delay in approving the application. *See T & D I, supra*, 125 B.R. at 120–21).

Although its decision regarding the effective date of appointment may not have been favorable to Comly's cause, in another way the district court in *Rheam III* was very generous to Comly. In *Rheam II*, 111 B.R. at 94, we recognized that, *if* Comly had requested appointment *nunc pro tunc*, *then* and only then would we have considered whether the requisite "extraordinary circumstances" for such appointment were made out. We would normally not, as the district court implicitly did, consider whether an application for appointment of counsel *nunc pro tunc* could or should have been granted when one has never been presented to the court. Our practice is to deny requests for pre-appointment services unless a motion for appointment *nunc pro tunc* has been granted.

■ With these introductory observations, we proceed to follow the district court's mandate to determine whether *nunc pro tunc* appointment of Comly is justified here. The Third Circuit Court of Appeals has clearly and narrowly delineated the bankruptcy court's discretion in allowing retroactive applications of professional persons. In *Arkansas, supra*, 798 F.2d at 650, the court provided a two-part test. Firstly, the court may grant retroactive approval only if it finds that it would have granted prior approval. This entails a determination that the applicant satisfies the statutory requirement of § 327(a) that the applicant be disinterested and that the services performed appear necessary and beneficial to the estate. *Id.* Secondly, the bankruptcy court must consider whether the particular circumstances in the case adequately excuse the failure to have sought prior approval. *Id.* The court stated that: "[s]uch circumstances do not include the mere neglect of the professional who was in a position to file a timely application." *Id.* The court listed the relevant factors as

> whether the applicant or some other person bore responsibility for applying for approval; whether the applicant was under time pressure to begin service without approval; the amount of delay after the applicant learned that the initial approval had not been granted; the extent to which compensation to the applicant will prejudice innocent third parties; and other relevant factors.

*Id.* The *Arkansas* court, in affirming the district court's denial of retroactive approval, held that *nunc pro tunc* applications should be limited to cases where the hardship is not one of the applicant's own making. There, where the counsel of the *Arkansas* creditors' committee failed to file a timely application for its own appointment through its own oversight, retroactive application was rather easily denied. *Id.* at 650–51.

■ Denial of Comly's retroactive application is consistent with *Arkansas*. Under the first test, Comly must show that the services for which it was hired to perform appeared to be necessary and beneficial to the estate, justifying appointment. *See Rheam II*, 111 B.R. at 99–101 (court will appoint a professional only if the need for its services are established). Through the prism of hindsight, certain of Comly's services, particularly the relocation of the Debtor's inventory, may not have been beneficial to the estate. However, since this court approved the application to employ Comly in its Order of July 19, 1988, it appears that the first test has been met.

Under the second part of the *Arkansas* test, the applicant must show adequate excuse for the failure to have sought prior approval. Some of the factors listed in the *Arkansas* decision cut in favor of Comly, some against. In Comly's favor are the facts that another person (the Trustee) bore the responsibility to file the application; it was under time pressure to begin work; and payment for its services would not unduly prejudice third parties. Cutting against Comly are its knowledge of the bankruptcy appointment process and its extremely long delay in filing the current motion.

Comly argues that, since it did not learn of the problem with its application until recently, the delay of over three and a half years from the date of its application in April, 1988, to December 5, 1991, in filing an application for *nunc pro tunc* appointment is justified. However, we believe that, if Comly were not aware of any problem with its application before now, it certainly should have been. Even when another party is responsible for filing an application to appoint a professional person, there is a duty imposed upon the professional to check on whether its employment has been properly approved. *Compare In re Metropolitan Hospital*, 119 B.R. 910, 911–17, 920–21 (Bankr.E.D.Pa.1990) (party whose very status as a professional was in issue and who constantly urged the debtor's counsel to act promptly was nevertheless denied *nunc pro tunc* appointment caused by the said counsel's delay).

The Court of Appeals, in *Airlease, supra*, also narrows the scope of the "time pressure" requirement. It holds that the test for that element is not whether there is a time pressure on the professional's need to perform its services, but "whether there is sufficient time to request court approval before the professional's services must begin." 844 F.2d at 107. Had the Trustee's counsel promptly certified no objection to Comly's application for appointment under LBR 9013.3(d)(1) and (d)(3), Comly could have been easily appointed as a professional person by May 1, 1988, prior to commencement of its services on May 4, 1988.

Considering the foregoing principles set forth in *Airlease,* this court reasoned, in *In re TM Carlton House Partners, Ltd.,* 93 B.R. 875, 877 (Bankr.E.D.Pa.1988), that the relevant time period in scrutinizing any delay in acquiring *nunc pro tunc* approval of a professional's appointment is the delay in applying for such approval, not the delay in making the original application for appointment. Thus, we must consider the delay factor in light of the failure of Comly to seek *nunc pro tunc* appointment in 1988, or even in 1990, when this court alerted the Trustee's counsel to the need of Comly to comply with the strictures of *Schwemmer Hardware.* It was only when Comly filed its Supplemental Application, and indicated the dates that it performed its services, that this court was apprised that it had performed its services prior to being appointed by this court. Yet no application for *nunc pro tunc* approval was filed until *after* the district court's remand, almost two years after the Supplemental Application was filed.

The *Arkansas* court, 798 F.2d at 650, expressly approved the reasoning approving the application of a professional for retroactive appointment in *In re Freehold Music Center,* 49 B.R. 293 (Bankr.D.N.J. 1985), where the applicant for employment was an accounting firm and the procedural application error was beyond its control. There, the debtor-in-possession hired the accountant, but failed to file an application as required under §§ 327(a) and 1107 and F.R.B.P. 2014(a). At all times, the accountant in good faith believed that its employment was properly authorized. *Id.* at 294. Upon discovering that its employment had not been authorized by the court and that the authorization was a prerequisite to payment, the accountant ceased working for the debtor. *Id.* Only upon securing court approval, did it resume work. *Id.* The court held that the failure of the debtor to fulfill its responsibility, coupled with the accountant's unfamiliarity with the relevant bankruptcy provisions, was sufficient to warrant retroactive appointment. *Id.* at 296.

By way of contrast, in the instant matter, Comly was well aware of the require-

ment that its employment must be pre-approved by the court. Stephen testified that he has been performing services for trustees in various bankruptcy courts for over 10 years. He knew that Trustee Barone was not an attorney and that he was initially not represented by counsel, facts which should have heightened Comly's scrutiny of the appointment process. Comly hence is not comparable to the naive professional present in the *Freehold* case. Therefore, we conclude that the reasoning in *Freehold* is inapposite to the matter at hand.

Whatever doubts might exist regarding the propriety of denying Comly's motion under the reasoning of *Arkansas* are extinguished by consideration of the later decision of the Court of Appeals in *Airlease,* *supra.* In *Airlease,* the professional argued that, unlike the *Arkansas* professional but like Comly, it did not bear the responsibility for its own appointment. 844 F.2d at 106. Nevertheless, the court placed a affirmative duty upon the professional to "know that such approval [of professional employment] is necessary and to insure that it has been sought." *Id.* at 107. Like the *Airlease* professional, Comly was well aware of the approval requirement. We find little or no significance in the fact that the *Airlease* professional had counsel who negotiated the terms of its employment. *Id.* Comly was bound to know what it was doing and to consult counsel if it had reason to know (as we believe it did) that its rights were subject to being compromised.

It is therefore logical and serves the purpose of the pre-appointment requirement to extend the duty placed on the professional by the *Airlease* court to include a duty of reasonable inquiry as to whether the application had been approved for the time period when the work was actually completed. The underlying basis for the court to impose a duty on the professional to know of the approval re-

quirements is to prevent circumvention of the pre-approval process by a non-attorney professional merely by citing a debtor's or trustee's oversight. *Id.* at 107. Ignorance is not to be rewarded, but to be eliminated wherever feasible. That same policy applies to a requirement that the professional ought to be sure that the application for employment covers the dates on which he has actually worked. To hold that there is a duty of the professional to see that his application has been sought, but that he has no duty to check that an approval covers the relevant dates, would be inconsistent.

We hence conclude that Comly does not fare particularly well under any of the *Arkansas* "relevant factors" except possibly lack of prejudice to innocent third parties. Therefore, application of both of the tests and the reasoning set forth in *Airlease* requires that Comly's motion for *nunc pro tunc* appointment be denied.

### 3. COMLY CANNOT BE AWARDED ANY OF ITS COMPENSATION SOUGHT UNDER ANY PROVISIONS OF 11 U.S.C. § 503 OTHER THAN § 503(b)(2).

█ Comly argues, in the alternative, that at least some of its services, specifically the expenses associated with moving the Debtor's property from one location to another, could and should be considered administrative claims under (apparently) § 503(b)(1)(A).[5] It further contends that payment of these administrative expenses under (presumably) § 503(b)(1)(A) does not require pre-approval by the court. We disagree.

In *Airlease, supra,* 844 F.2d at 108–09, the Court of Appeals rejected a similar argument. There, it held that a broker who failed to acquire pre-approval under § 327(a) was precluded from circumventing the requirements of § 327(a) by relying on § 503(b)(1)(A). The court reasoned that, if compensation were allowed under § 503(b)(1)(A), then § 327(a) would be ren-

---

5. In making this argument in his Brief, Comly's counsel appears to have become confused. He argues that Comly should be allowed a "general administrative expense" under § 503(b)(2). Actually, § 503(b)(2) references the "compensation

and reimbursement awarded under section 330(a)" of the Code, which pertains to parties employed under § 327(a) of the Code, *i.e.,* professionals.

dered nugatory, thus contravening Congress' intention in requiring prior approval of professionals. *Id.* Comly should similarly not be permitted to circumvent the pre-approval process.

Comly further argues that the moving work was not "professional" work, and it therefore does not fall within § 327(a). To contend that some of the work completed by Comly is professional (*i.e.*, conducting the actual public sale) and that other work is non-professional (*i.e.*, the move) appears to us to be merely a variant attempt to circumvent the pre-approval process and should be prohibited. Such an attempt appears especially egregious where the move expenses greatly exceeded the sale expenses.

As we read the Code, all work performed by professionals must be treated as professional "compensation and reimbursement" under § 503(b)(2) and cannot be bifurcated between professional and non-professional work. If a professional does non-professional work, *e.g.*, an attorney or paralegal requests compensation for secretarial and other clerical tasks, these requests are generally denied as noncompensable overhead. *See, e.g., In re Busy Beaver Building Centers, Inc.*, 133 B.R. 753, 756–57 (Bankr. W.D.Pa.1991); *In re CF & I Fabricators of Utah, Inc.*, 131 B.R. 474, 485–86 (Bankr. D.Utah 1991); *In re Motor Freight Express*, 80 B.R. 44, 47 (Bankr.E.D.Pa.1987); and *In re Metro Transportation Co.*, 78 B.R. 416, 418–19 (Bankr.E.D.Pa.1987), *aff'd in part & remanded in part on other grounds*, 107 B.R. 50 (E.D.Pa.1990).

In *Schwemmer Hardware, supra*, 103 B.R. at 641–42, we were particularly critical of an attempt of an auctioneer to obtain reimbursement of costs for "labor." We analogized the attempt of an auctioneer to request reimbursement for such a charge to an attorney's claiming compensation on a contingent-fee basis (which we analogized to an auctioneer's commissions), while adding to it compensation computed on a lodestar basis (which we analogized to an auctioneer's attempting to obtain reimbursement for labor costs). *Id.* at 642.

As indicated in *Rheam II*, 111 B.R. at 95, we believe that this assessment was too harsh. We now hold that labor of an auctioneer's employees, if well documented by identification of, and a brief statement of the qualifications of, the employee; a description of services performed; a description of hours worked and the rate of compensation; and a brief description of the necessity for the work provided, should generally be compensable. The relatively modest commission rates charged by auctioneers simply do not, in light of our experiences since *Schwemmer Hardware* was published, justify the conclusion that all labor costs of auctioneers must be absorbed in their commissions. However, we continue to believe that such labor costs are an incident to the professional services of auctioneers, and are allowable to auctioneers only if the auctioneer is properly and timely appointed as a professional person and such costs are properly documented. *See In re L & S Industries, Inc.*, 112 B.R. 886, 887 (Bankr.N.D.Ohio 1990) (full description of auctioneer's costs is required); and *In re Cal Farm Supply Co.*, 110 B.R. 461 (Bankr.E.D.Cal.1989) (large "labor" costs of an auctioneer are disallowed as overhead).

In its argument on this point, Comly relies heavily upon *In re Fretheim*, 102 B.R. 298 (Bankr.D.Conn.1989). However, we believe that the reasoning and result in *Fretheim* are distinguishable and therefore totally inapposite to the issue at hand. In *Fretheim* the issue was whether a land surveyor was or was not a "professional" under the Bankruptcy Code. The court looked to the extent and nature of the surveyor's involvement in the administration of the case and held that, due to its "tangential relationship" to the administration of the case, the surveyor was not a professional. *Id.* at 299. *Accord, In re Windsor Communications Group, Inc.*, 68 B.R. 1007, 1010–03 (E.D.Pa.1986) (it is doubtful that a collection agency is a professional, and, hence, it was probably not required to be appointed as a professional prior to receiving compensation).

Clearly, the issue in *Fretheim* was not the issue argued by Comly here, *i.e.*, whether some of the work completed by a professional person, as defined by the

Code, may be considered non-professional work, compensable under a Code section other than 11 U.S.C. § 503(b)(2).

Other authority, addressing the issue at hand, concludes that, when the Code defines a party as a professional, all work completed by that party must be considered professional services compensable only under § 503(b)(2). *See In re Yeisley,* 64 B.R. 360 (Bankr.S.D.Tex.1986) (party appointed as an auctioneer was not permitted to receive compensation for non-professional services in conducting a "private treaty" sale of the debtor's assets); and *In re Impact Publications, Inc.,* 24 B.R. 980, 982 (Bankr.N.D.Tex.1982) (a professional may be compensated for only those services she was appointed to perform).

Without reopening the differences between the district court in *Rheam III,* 133 B.R. at 338–39, and this court in *Rheam II,* 111 B.R. at 95, regarding the issue of whether moving expenses were reasonably contemplated within the scope of the Order of July 19, 1988, appointing Comly, we note that this order clearly appointed Comly as an auctioneer. The moving expenses, if within the scope of this Order, must be found to be incidental to the professional services which were to be compensated by, *inter alia,* the commissions receivable, the rate of computation of which was prominently designated in the Order. The form of the Order, and particularly the analysis of it in *Rheam III,* support the conclusion that the moving expenses must be viewed as part of Comly's engagement. The district court's mandate contemplates that the right to recover such costs rises or falls with Comly's right to appointment as a professional person *nunc pro tunc.*[6]

## D. CONCLUSION

Regretfully, we must conclude that, upon fulfillment of the district court's mandate

that we determine, *sua sponte* if necessary, whether Comly is entitled to appointment as a professional person *nunc pro tunc,* Comly must be denied all compensation, even the $14,924.21 which we awarded it in *Rheam II.* Our conscience is clear of any intention to "punish" Comly for its appeal, as we offered it a chance to retain this sum rather than proceed with the hearing on December 19, 1991. However, we cannot quarrel with the district court's conclusion that the sort of compromise attempted in the *Rheam II* Order as to Comly is probably legally indefensible.

In our Order accompanying *Rheam II,* we established a schedule for the completion of administration of this case. It was not adhered to by the Trustee's counsel, perhaps because its own appeals from *Rheam II* were pending. On the theory that creditors of the Debtor should not be further delayed receipt of their distributive shares while professionals fight the court over their rights to compensation, we will enter another, similar Order. Furthermore, we will insist that the Trustee proceed to comply with this Order irrespective of any appeal Comly might take from this Order, thereby requiring any party contesting outstanding Orders to convince a court, in seeking a stay of this Order, that its rights rise to a higher level than those of the Debtor's creditors to a prompt distribution.

An appropriate Order will be entered.

## ORDER

AND NOW, this 27th day of February, 1992, December, 1991, after a hearing of December 19, 1991, on the Motion of WILLIAM F. COMLY & SON, INC. ("Comly") to be appointed as a professional *nunc pro tunc* ("the Motion"), and careful consideration of Comly's post-trial Brief, it is hereby ORDERED as follows:

---

6. Comly suggests, in its Brief, that this court unfairly applied the standards of *Schwemmer Hardware* in ruling on its Supplemental Application, because *Schwemmer Hardware* was decided after it performed its services. This argument is irrelevant to the decisive issue of whether Comly was obliged to file an application to seek appointment as a professional person and obtain *nunc pro tunc* appointment. Although *Schwemmer Hardware* is very clear on this

point, 103 B.R. at 638–39, 11 U.S.C. § 327(a) itself is no less clear, because it specifically references "auctioneers." Insofar as *Schwemmer Hardware* was applied to require specific disclosures of items of costs in Comly's application, it should be recalled that, in our Order of January 17, 1990, we specifically provided Comly an opportunity to amend its application to conform it the pronouncements of *Schwemmer Hardware,* of which it availed itself.

1. The Motion is DENIED.

2. Comly's Application and Supplemental Application for commissions and reimbursement of expenses are DENIED in their entirety, and paragraph two of our Order of February 26, 1990, is therefore VACATED.

3. The Trustee or his counsel shall submit a proposed Order for Distribution consistent with this Order and our prior Order of February 26, 1990, on or before March 5, 1992.

4. The Trustee or his counsel shall thereafter file the cancelled checks and zero bank statement; or an affidavit, pertaining to disbursements made pursuant to the Order of Final Distribution, setting forth that there is a zero balance in the account, or that the cancelled checks are no longer available, on or before July 1, 1992.

5. The Trustee shall not delay in making these submissions on account of any appeal, unless this Order is stay by an Order of a court of competent jurisdiction.